John Anthony SAENZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–02–00593–CR.

Court of Appeals of Texas,
San Antonio.

Nov. 5, 2003.

Rehearing Overruled Jan. 8, 2004.

Richard E. Langlois, Law Offices Of Richard E. Langlois, San Antonio, for Appellant.

Kerrisa J. Chelkowski, Asst. Crim. Dist, Atty., Cadena–Reeves Justice Center, San Antonio, for State.

Sitting: CATHERINE STONE, Justice, PAUL W. GREEN, Justice, KAREN ANGELINI, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

Appellant John Anthony Saenz was convicted of three counts of capital murder and sentenced to three concurrent terms of life imprisonment. On appeal, Saenz argues that the trial court should not have entered three separate judgments and sentences and that by doing so, the trial court violated his double jeopardy rights. Additionally, Saenz complains of instructions given to the jury by the trial court. Finally, Saenz argues that the evidence is factually insufficient to support his convictions. Because Saenz's double jeopardy argument has merit, we affirm the judgment on count I, but reverse and render judgments of acquittal with respect to counts II and III.

### Background

Appellant John Anthony Saenz and his brother, Eric Saenz, were members of a gang called the HPL or "Hermanos Pistoleros Latinos." Adrian Torres, one of the victims, was a member of a gang called the Mexican Mafia. Saenz's wife, Priscilla, and Adrian were childhood friends. Although Saenz and Adrian were members of rival gangs, they remained friendly because of personal ties.

On Thursday, September 14, 2000, Adrian "fronted" Saenz two ounces of cocaine. Saenz was supposed to sell the cocaine for Adrian, keeping a small profit for himself. On Friday morning, September 15th, Saenz went to the HPL "dope house" with the intention of selling the cocaine. However, no one was at the house. So, instead of selling the cocaine, Saenz began using the cocaine himself, smoking it as "crack." That same day, Adrian called Saenz's home. Priscilla answered. Adrian told Priscilla that he was looking for Saenz. Priscilla then went to the "dope house" and was angry when she saw Saenz using Adrian's cocaine. Priscilla told Saenz that Adrian was looking for him and asked Saenz to come home. According to Saenz, he was embarrassed that Priscilla saw him "so messed up," so he pushed her and told her to go away. Priscilla was at home when Adrian arrived, looking for his drugs. Adrian looked for his drugs in Saenz's usual hiding place to no avail. Because she was angry with Saenz, Priscilla told Adrian that Saenz was using the drugs. Hearing this information, Adrian became angry.

On Saturday, September 16th, Priscilla and Saenz checked into a motel so that they could avoid Adrian. Priscilla had left their children with her mother. She and Saenz then began using Adrian's cocaine. Adrian called Saenz's home several times. Jackie, Saenz's niece, answered the phone, telling Adrian that she did not know where Saenz was. That night, Adrian went to Saenz's house, looking for Saenz. Jackie, accompanied by her boyfriend Omar, answered the door, again explaining to Adrian that she did not know where her uncle was. Adrian then asked Jackie if she knew that Saenz owed him "some stuff." Jackie said that she did not. With Omar standing next to Jackie, Adrian said to Jackie, "Look, Jackie, you know I'm Eme,[1] you know Anthony's Pistolero. If that's the way he's going to handle it, I'm going to come tomorrow." According to Saenz's written statement, he considered this statement by Adrian as a threat to his family. He believed that Adrian had "told

---

1. "Eme" refers to the Mexican Mafia.

Jackie that he was going to be back and he was going to bring all of his 'carnales' with him. This scared Jackie and it made me [Saenz] so mad when she told me about it that I wanted to kill [Adrian] right then."

Saenz went home on Sunday morning. He knew that Adrian was supposed to come over around 1:00 p.m. Saenz called his brother, Eric, and asked him to bring money to pay Adrian. Eric told Saenz that he would be over. According to Saenz, he was afraid that Adrian would arrive with many Mexican Mafia members. So, when Eric did not show up, Saenz called two HPL members, Miguel "Fatboy" Paredes and Greg "Mac 11" Alvarado. Fatboy and Mac 11 arrived with two shotguns and a handgun. Fatboy awaited Adrian's arrival in the garage while Mac 11 waited in the master bedroom. Jackie and her boyfriend, Omar, were in a smaller bedroom. Saenz told them that if they heard arguing to stay in the room.

Around 1:00 p.m., Adrian arrived at Saenz's house. Adrian's friend, Shawn Cain, was driving the car. Adrian's girlfriend, Nelly Bravo, was in the backseat of the car. Saenz let Adrian into the house while the other two waited in the car. Adrian demanded all of his drugs. Saenz explained that he did not have all of the drugs, but that Eric would be coming over with the money. Saenz then told Adrian he should invite his friends in while they waited for Eric. Nelly and Shawn came in and sat on the sofas in the living room. Adrian told Saenz that Saenz better pay him for his drugs and better not think about "burning him because he was Mexican Mafia." Adrian said that he was not going to leave until he got all of his drugs back.

Saenz called Eric again, but could not reach him. Adrian told Saenz to just give him what Saenz had right then. Saenz handed Adrian a tied plastic bag with the cocaine in it. According to Saenz, Adrian usually bit open the bag. However, this time, Adrian grabbed a knife to open the bag. Adrian then looked at Nelly, and according to Saenz, gave Nelly some type of signal. Saenz then claims to have seen a gun in Nelly's purse. On the pretext of getting a syringe for Adrian, Saenz quickly went into the garage where Fatboy was waiting. He grabbed a shotgun, came back into the kitchen where Adrian was sitting at the kitchen table, and shot Adrian in the neck. Fatboy and Mac 11 came out of their hiding spaces and shot Shawn and Nelly. According to Jackie, who was in a bedroom of the home, she heard gunshots and then a woman say, "No, Anthony, No." And, then she heard more gunshots. Saenz then called other HPL members to help him dispose of the bodies. They dumped the bodies in Frio County and then burned them.

On his way back from disposing of the bodies, Saenz stopped at Eric's house and told him all that had happened. Eric, who was a confidential informant, called Special Agent Darby Wheeler the day after the murders and told Wheeler everything.

The indictment charged Saenz with three counts of capital murder. The jury found Saenz guilty of all three capital murders. The trial court entered a separate judgment for each count of capital murder, sentencing Saenz to three concurrent terms of life imprisonment. Saenz now appeals, bringing seven issues.

## FACTUAL SUFFICIENCY

■ According to Saenz, the evidence is factually insufficient to support the jury's rejection of his self-defense claim. When an appellant challenges the factual sufficiency of the jury's rejection of a defense, we review all of the evidence in a neutral light and ask whether the State's evidence taken alone is too weak to support the

finding and whether the proof of guilt, although adequate if taken alone, is against the great weight and preponderance of the evidence. *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex.Crim.App.2003).

■ We must first determine whether the State's evidence taken alone is too weak to support the finding. Saenz's second statement to the police was admitted in evidence as State's Exhibit 159. In the statement, Saenz states that when he found out from Jackie that Adrian had told Jackie that he was going to be back and bring all of his "carnales" with him, Saenz was so mad that he wanted to kill Adrian right then. Saenz describes having Fatboy and Mac 11 hide in his home. He then states that Adrian "was very arrogant toward me." When he gave Adrian the drugs, Adrian went to the kitchen table to get a "fix." Nelly Bravo then turned toward Adrian, and Saenz saw that she had a revolver in her purse. According to Saenz's statement:

> When I saw that Adrian's girlfriend had a gun, I thought that they were going to try to shoot me when they got high on cocaine. I told Adrian that I could get him a rig (to shoot the drugs). I then went into the garage and got my shotgun. I immediately turned the shotgun on Adrian and I shot him once or twice (I only had two shells). I know that I shot him in the throat.

Given Saenz's second statement, the State's evidence taken alone is not too weak to support the jury's finding.

■ We must next determine after a neutral review of the evidence whether the proof of Saenz's guilt is against the great weight and preponderance of the evidence. According to Saenz, there is evidence that Adrian had threatened him and his family. After Adrian, Nelly, and Shawn came into his house on that Sunday, Saenz testified that Adrian picked up a knife to open up a plastic bag containing the drugs. Saenz testified that Adrian using a knife to open the bag was unusual, as Adrian usually used his teeth. Then, according to Saenz, he saw a gun in Bravo's purse and that he saw Adrian give Bravo a "signal." According to Saenz, he believed that Adrian, Nelly, and Shawn were going to shoot him. On cross-examination, however, Saenz admitted that Adrian never really made a move in an attempt to kill him:

Q: So, Adrian typically, according to you, bites off the knot to get to his dope.

A: Yes.

Q: But this time he took a knife from the table?

A: Yes, he did.

Q: To get his dope.

A: Yes.

Q: And at that point you state that you were afraid because Adrian had a knife in his hand?

A: I was afraid because of his demeanor, the way he looked at me. He had an evil presence to him. Adrian wasn't the Adrian that I knew that day. When he came to my house and the way he came across to me wasn't the Adrian that I knew. It wasn't my friend Adrian that I knew for many years. Not—not that day.

Q: Okay. But you weren't worried about telling Adrian that you didn't like him disrespecting your wife and threatening your family.

A: No.

Q: Because you said in your statement that's what you told him.

A: Yes. Yes.

Q: And you said he was very arrogant towards you.

A: Yes, he was.

Q: Well, now, there's a difference between arrogant and threatening.

A: Well—

Q: In your statement you say that he was very arrogant towards you.

A: There's a difference [in] what it means to you and what it means to me, yes.

\* \* \*

Q: Fact of the matter is, Mr. Saenz, that when those three people were sitting in your living room—

A: Yes.

Q: —you knew at that point, despite what you say you were worried about, you knew at that point that this was no Mexican Mafia highjacking.

A: No, I—I—I didn't know that. I mean, I was waiting for more Mexican Mafia members to get there, yes. That—that I was waiting for because of the way Adrian was coming across to me. Like, you know, he didn't care what I thought or anything. He was there—

Q: But that—that five to ten minutes he was there in the house with you—

A: Yes.

Q: —without his girlfriend and his friend—

A: Yes.

Q: —in there, you weren't worried about it.

A: I suppose he was waiting to get the dope. He wasn't going to make a move until he got his dope.

Q: He never got a chance to make a move, did he?

A: Well, if—if I would have waited—I feel if I would have waited, I probably wouldn't [be] here.

Saenz then testified that Adrian grabbed the knife and that Shawn reached for Nelly's gun. Saenz admitted, however, that these assertions were not in his statements to the police.

Additionally, Eric Saenz testified that Saenz, his brother, told him about what had happened that Sunday afternoon. According to Eric Saenz's testimony, Adrian and Nelly were using cocaine, and Adrian asked Saenz to go get a syringe. Then, Saenz went into the garage, supposedly to get a syringe. He then got his gun and told Fatboy to "take care of business, something's going to go down." When Saenz shot Adrian in his neck, Adrian was sitting by the kitchen table doing some cocaine. Mac 11 then shot Shawn in the living room while Fatboy walked over to where Nelly was sitting on the sofa in the living room. Nelly pleaded for her life on her knees, promising that she would not say anything. Fatboy shot Nelly with a handgun. Nelly was still alive, saying that she did not want to die. Eric testified that Saenz then told Fatboy to finish her off. Fatboy and Mac 11 then began beating Adrian's body. Saenz went up to Adrian's body, took the dope from the body, and said to Adrian's body, "That's what you get for fucking up and threatening me."

After reviewing all of the evidence in a neutral light, we hold that the proof of Saenz's guilt is not against the great weight and preponderance of the evidence. This issue is overruled.

## SAME OFFENSE?

### A. Misjoinder

In his next issue, Saenz complains that the trial court erred in entering three separate judgments and imposing three separate sentences. According to Saenz, the three counts of capital murder as charged in the indictment constitute only one of-

fense of capital murder, not three. The State disagrees, arguing that each count of capital murder constitutes a separate offense.

■ It is a well-settled common-law rule in Texas that unless some statutory or judicial exception applies, one indictment can result in no more than one conviction and one punishment. *Ex parte Siller,* 686 S.W.2d 617, 618 (Tex.Crim.App.1985). Thus, Saenz's three convictions cannot stand unless some statutory or judicial exception applies here. Article 21.24(a) of the Texas Code of Criminal Procedure is such a statutory exception to the rule of only one conviction per indictment. *See* TEX.CODE CRIM. PROC. ANN. art. 21.24(a) (Vernon 1989). Article 21.24(a) permits joinder of more than one offense in one indictment if the offenses arise out of the same criminal episode and each offense is stated in a separate count. *Id.* No paragraph of an indictment may charge more than one offense. *Id.* 21.24(b). When these provisions are violated in a manner that results in the defendant being convicted of more than one offense based on one indictment, the defendant suffers harm. *Shavers v. State,* 881 S.W.2d 67, 73 (Tex. App.-Dallas 1994, no pet.). When one of two convictions from a single indictment must be vacated, the court of criminal appeals has held that the less "serious" offense should be vacated. *Ex parte Pena,* 820 S.W.2d 806, 809 (Tex.Crim.App.1991). The determination of which offense is less serious involves consideration of the degree of the offense, the sentences imposed, firearm findings, and differences in parole eligibility. *Id.*

■ Here, count I alleges the capital murder of Adrian Torres. The aggravating element alleged is the murders of Nelly Bravo and Shawn Cain in the same criminal transaction. Count II alleges the capital murder of Nelly Bravo. The aggravating element alleged is the murders of Adrian Torres and Shawn Cain in the same criminal transaction. Count III alleges the capital murder of Shawn Cain. The aggravating element alleged is the murders of Adrian Torres and Nelly Bravo in the same criminal transaction. The jury found Saenz guilty on all three counts of capital murder.[2] The trial court sentenced Saenz to three concurrent life sentences. All three allegations of capital murder were committed during the same criminal transaction. Thus, pursuant to article 21.24, the three counts were properly charged in the same indictment so long as the three counts constitute three separate offenses. If the three counts are only one offense, then the trial court did err in sentencing Saenz to three concurrent sentences. To determine whether the three counts of capital murder constitute separate offenses, we must look to Saenz's second and third issues relating to double jeopardy.

## B. Double Jeopardy

### 1. Waiver

■ Saenz complains that the State violated his double jeopardy rights[3] by prosecuting him three times for the same offense, capital murder. According to the State, Saenz waived this issue by failing to

---

**2.** On the first special issue regarding imposition of the death penalty, the jury answered that at least ten jurors have a reasonable doubt as to the probability that Saenz would commit criminal acts of violence that would constitute a continuing threat to society. As such, the trial court sentenced Saenz to life imprisonment.

**3.** In his brief, Saenz admits that his double jeopardy rights under the Texas Constitution are the same as his rights under the United States Constitution.

object at trial. Generally, a double jeopardy claim must be raised in the trial court to preserve the error for appellate review. *Gonzalez v. State,* 8 S.W.3d 640, 643–46 (Tex.Crim.App.2000); *Honeycutt v. State,* 82 S.W.3d 545, 547 (Tex.App.-San Antonio 2002, pet. ref'd). In *Gonzalez,* however, the court of criminal appeals provided for an exception to this general rule as determined through a two-part test: an appellant may raise a double jeopardy claim for the first time on appeal (1) when the undisputed facts show the double jeopardy violation is clearly apparent from the face of the record and (2) when enforcement of the usual rules of procedural default serves no legitimate state purpose. *Gonzalez,* 8 S.W.3d at 643; *Honeycutt,* 82 S.W.3d at 547. Here, Saenz stood trial for all three capital murders before the same judge. All three counts being before the trial court, the court knew or should have known of a potential jeopardy issue. *See Honeycutt,* 82 S.W.3d at 548; *Beltran v. State,* 30 S.W.3d 532, 533 n. 1 (Tex.App.-San Antonio 2000, no pet.). Moreover, the record in this case is fully developed. The reporter's record of the trial has been filed, and the clerk's record contains the indictment charging Saenz for three counts of capital murder. We can resolve Saenz's claim based on the record before us, and there is no need for further proceedings to add new evidence to the record. *See Beltran,* 30 S.W.3d at 533 n. 1. Accordingly, Saenz has satisfied the first prong of the *Gonzalez* test.[4]

With respect to the second prong of the test, we find that enforcement of the usual procedural default rules would serve no legitimate state purpose. The appropriate remedy for any double jeopardy violation is to vacate one of the convictions. *Ball v.*

*United States,* 470 U.S. 856, 864–65, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985); *Landers v. State,* 957 S.W.2d 558, 559 (Tex. Crim.App.1997). Under Texas law, we are required to retain the conviction with the "most serious punishment," and vacate any remaining convictions that are the "same" for double jeopardy purposes. *Landers,* 957 S.W.2d at 560. Here, if Saenz is successful, we would vacate two of his convictions for capital murder and retain one conviction for capital murder. A successful challenge would not require a retrial or even a remand to the trial court. Therefore, there are no legitimate state interests that would be negatively impacted from allowing Saenz to raise his double jeopardy claim for the first time in this appeal. *Shaffer v. State,* 477 S.W.2d 873, 875–76 (Tex.Crim.App.1971); *Honeycutt,* 82 S.W.3d at 547. Because we find that the two-part *Gonzalez* test has been satisfied, we hold that Saenz may raise this issue for the first time on appeal.

2. Analysis

■ The Double Jeopardy Clause protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *Lopez v. State,* 108 S.W.3d 293, 295–96 (Tex.Crim.App.2003) (citing *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072 (1969)). Saenz's double jeopardy claim is based on the third category.

■ The State charged Saenz with three violations of the same statute, capital murder. If each alleged violation of the statute was a separate "allowable unit of prosecution," Saenz's double jeopardy

---

4. Our facts are distinguishable from those in *Gonzalez.* There, the face of the record failed to show a jeopardy violation. *Gonzalez,* 8 S.W.3d at 645. In *Gonzalez,* the appellant conceded that if the jury's general guilty verdict of aggravated robbery rested on paragraph two of the indictment, then his double jeopardy rights were not violated. *Id.*

rights were not violated.[5] *Ex parte Hawkins,* 6 S.W.3d 554, 556–57 (Tex.Crim.App. 1999). Whether an offense is a separate "allowable unit of prosecution" depends upon legislative intent and statutory construction. *Id.* We must, therefore, look to the language of the statute itself.

For assault-type offenses, the allowable unit of prosecution is each victim. *Id.* at 560. Thus, the court of criminal appeals explained in *Hawkins* that the Double Jeopardy Clause is not violated by multiple prosecutions for robbery when multiple assaults are committed in the course of only one theft. *Id.* at 561. The court then went on to hold that prosecuting the appellant twice for robbery did not violate the Double Jeopardy Clause because the allowable unit of prosecution for robbery is each victim, and the appellant assaulted two victims in the course of committing a theft. *Id.* Similarly, the court of criminal appeals has held that in prosecutions for involuntary manslaughter involving multiple deaths, each individual death constitutes a complete and distinct offense. *Ex parte Rathmell,* 717 S.W.2d 33, 35 (Tex.Crim.App.1986). Accordingly, each death constitutes a separate "allowable unit of prosecution." *Id.* "It is universally accepted that when a defendant, by a single physical act, assaults or kills two or more persons, the Double Jeopardy Clause does not bar separate prosecutions for each victim assaulted or killed." *Spradling v. State,* 773 S.W.2d 553, 556 (Tex. Crim.App.1989).

Indeed, the court of criminal appeals has characterized capital murder as "the capital murder of [the victim]." *See Graham v. State,* 19 S.W.3d 851, 854 (Tex.Crim. App.2000). In *Graham,* the indictment arose out of appellant's alleged participation in a drug-related robbery during which three individuals were killed. *Id.* at 852. The State presented the jury with a single, three-paragraph indictment alleging that appellant committed capital murder by (1) causing the death of Heimar Prado Hurtado and the death of Danny Giraldo during the same criminal transaction; (2) causing the death of Hurtado while in the course of robbing him, and (3) causing the death of Jesus Garcia–Castro while in the course of robbing him. *Id.* In determining whether these accusations constituted one offense, the court of criminal appeals emphasized that "two of the three paragraphs allege *different murders* as the basis for the capital charge." *Id.* at 853 (emphasis in original). The court noted that as a predicate to charging capital murder, the Penal Code requires that a defendant commit murder as defined under section 19.02(b)(1). *Id.* That predicate murder is then aggravated to capital murder where any one of eight additional circumstances are present. *Id.*

The court of criminal appeals then noted that in *Hathorn v. State,* 848 S.W.2d 101 (Tex.Crim.App.1992), the murder of the appellant's father served as the predicate to the capital murder charge. *Graham,* 19 S.W.3d at 853. That murder was aggravated to capital murder through the indictment's alternative theories that it was (1) committed in the course of robbery and burglary; (2) committed for remuneration or the promise of remuneration; or (3) murder for hire. *Id.* at 853–54. The court of criminal appeals explained that despite

---

5. In cases involving multiple violations of the same statute, the rule of statutory construction established by the Supreme Court in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), does not apply. *Ex parte Hawkins,* 6 S.W.3d 554, 556 (Tex.Crim.App.1999). *Blockburger* established the "same elements" test for the purposes of double jeopardy analysis. The *Blockburger* test applies in cases involving alleged violations of two distinct statutory provisions. *Id.*

these three alternative theories, the indictment only alleged *one* offense—the capital murder of the appellant's father. The court then distinguished these facts from those in *Graham:*

> In the instant case, however, there are multiple murders rather than multiple theories. In two of the alternative paragraphs, the indictment alleges the capital murder of Hurtado. That capital murder charge is supported by the alternative theories that appellant murdered Hurtado (1) while in the course of robbing him, and (2) during the same criminal transaction where he murdered Giraldo. The final paragraph, however, alleges a different capital murder—specifically, that of Garcia–Castro. That capital murder offense is supported by the single theory that appellant murdered Garcia–Castro while in the course of robbing him. Thus, unlike *Hathorn* where the indictment alleged multiple theories for committing one capital murder (that of the appellant's father), the indictment in the instant case alleged two distinct capital offenses (the capital murder of Hurtado and the capital murder of Garcia–Castro).

*Graham,* 19 S.W.3d at 854. The court of criminal appeals, however, noted the following in a footnote:

> This *would be a different case, of course,* if the murder of Garcia–Castro was being used as an aggravating circumstance to enhance Hurtado's murder into capital murder. *See, e.g., Shavers v. State,*

881 S.W.2d 67, 74 (Tex.App.-Dallas 1994, no pet.) (noting that although indictment contained two distinct murders, *one of the murders was used as aggravating circumstance to charge a single capital murder*).

*Id.* at 854 n. 3 (emphasis added). This issue is, of course, what we are being asked to decide now.

Here, according to the State, Saenz committed capital murder by violating section 19.03(a)(7)(A) of the Texas Penal Code. Section 19.03(a)(7)(A) provides that a person commits capital murder if he *murders more than one person* during the same criminal transaction. Tex. Pen.Code Ann. § 19.03(a)(7)(A) (Vernon 2003). Looking at statutory construction, section 19.03(a)(7)(A) defines capital murder as the murder of more than one person. Unlike other assault-type offenses that require only one victim,[6] section 19.03(a)(7)(A) states that in committing capital murder, a person must murder more than one victim. As such, section 19.03(a)(7)(A) necessarily requires the murder of more than one victim. Therefore, we hold that the allowable unit of prosecution for section 19.03(a)(7)(A) is more than one victim.

Here, Saenz was accused in three separate counts of the capital murder of three victims. If the allowable unit of prosecution is more than one victim, Saenz necessarily committed only one capital murder. All three counts contain the

6. Under other theories of capital murder, only one victim is required. *See* Tex. Pen.Code Ann. § 19.03 (Vernon 2003). For example, pursuant to section 19.03(a)(1), a person commits capital murder if he intentionally or knowingly causes the death of a peace officer or fireman who is acting in the lawful discharge of an official duty and who the person knows is a peace officer or fireman. *Id.* Similarly, pursuant to section 19.03(a)(3), a person commits capital murder if he intentionally or knowingly causes the death of an individual and if he committed the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration. *Id.*

same victims, the same allowable unit of prosecution. All three counts, therefore, constitute only one offense of capital murder. Because the indictment states only one allowable unit of prosecution, Saenz can be convicted of only one offense.[7] As such, Saenz's double jeopardy rights were violated. Moreover, because the three counts of capital murder constitute a single offense, the indictment did not comply with article 21.24(a) of the code of criminal procedure. In such a situation, a defendant suffers harm. *Shavers v. State*, 881 S.W.2d 67, 73 (Tex.App.-Dallas 1994, no pet.)

When a defendant's double jeopardy rights are violated, the remedy is to vacate the judgments for counts II and III. *Ball*, 470 U.S. at 864, 105 S.Ct. 1668; *Landers*, 957 S.W.2d at 559. Similarly, when an indictment does not comply with article 21.24(a), the remedy is to vacate the less "serious" offense. *Ex parte Pena*, 820 S.W.2d 806, 809 (Tex.Crim.App.1991). We, therefore, affirm the judgment on count I, but reverse and render judgments of acquittal on counts II and III.[8]

## JURY CHARGE

In his fourth, fifth, and sixth issues, Saenz complains that the jury charge allowed the jury to first consider him as the principal actor in the murder of the predicate offense and then allowed the jury to consider him as a party to the murder of the two victims alleged to enhance the offense to capital murder. According to Saenz,

> there was not legal support to authorize a conviction of capital murder for conduct where appellant committed the predicate offense but acted as a party to the aggravating offense of murder. Either appellant was a principal actor or he was a party. The law does not authorize hybrid culpability.

Saenz provides no support for these assertions. In the previous paragraph, he cites to *Chatman v. State*, 846 S.W.2d 329, 330 (Tex.Crim.App.1993), but fails to demonstrate how that case applies to his assertions. Because Saenz has failed to adequately brief issues four, five, and six, we overrule them. *See* Tex.R.App. P. 38.1(h).

## CONCLUSION

Because Saenz's double jeopardy rights were violated, we affirm the judgment with respect to count I, but reverse and render judgments of acquittal in counts II and III.

---

7. We note that murder only requires a single victim. Thus, had the State indicted Saenz for the murders of Adrian Torres, Nelly Bravo, and Shawn Cain, rather than the capital murders of those three individuals, Saenz could have been convicted for all three murders without his double jeopardy rights being violated.

8. In his brief, Saenz states that this error should be analyzed pursuant to *Almanza v. State*, 686 S.W.2d 157 (Tex.Crim.App.1984) (op. on reh'g). However, the above cited cases hold that the proper remedy is to vacate the less serious offense.