**Michael Joseph BIEN, Appellant**

v.

**The STATE of Texas, Appellee**

Nos. 11–14–00057–CR & 11–14–00058–CR

Court of Appeals of Texas,
Eastland.

Opinion filed March 3, 2016

Discretionary Review Granted
September 14, 2016

Michael Murray, District Attorney, Elisha Bird, Assistant, for State of Texas.

Cynthia L. Hampton, Keith S. Hampton, for Appellant.

Panel consists of: Wright, C.J., Willson, J., and Bailey, J.

## OPINION

JIM R. WRIGHT, CHIEF JUSTICE

The jury convicted Michael Joseph Bien of the offenses of criminal attempt—capital murder (Cause No. CR22319) and criminal solicitation to commit capital murder

(Cause No. CR22320) and assessed Appellant's punishment for each offense at confinement for life. *See* Tex. Penal Code Ann. §§ 15.01, 15.03 (West 2011), § 19.03 (West Supp.2015). The trial court ordered that the sentences were to run concurrently. We affirm the judgment in Cause No. CR22320 and reverse the judgment in Cause No. CR22319.

Appellant presents two identical issues in each appeal. In his first issue, Appellant argues that the trial court erred when it authorized the jury to return multiple verdicts for the same offense. Appellant contends that his convictions violate the Double Jeopardy Clause of the United States Constitution and the Texas constitution. In his second issue, Appellant complains that the evidence is insufficient to support the convictions because the State failed to refute Appellant's entrapment defense.

Appellant asks this court to decide this appeal under the Texas constitution rather than under the federal constitution. Appellant details the textual differences between the double jeopardy provisions of each constitution, but concedes that the result would be the same under either constitution. Further, we have previously said that the Texas constitution's double jeopardy clause does not provide broader protection than the federal constitution. *In re Morris*, No. 11–05–00381–CR, 2006 WL 1431122, at *2 n. 1 (Tex.App.—Eastland May 25, 2006, pet. ref'd) (not designated for publication); *Ex parte Beeman*, 946 S.W.2d 616, 617 (Tex.App.—Fort Worth 1997, no pet.). Accordingly, our analysis is the same under both constitutions.

■ Under the U.S. Constitution, the Double Jeopardy Clause provides, in part, that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "The Double Jeopardy Clause protects criminal defendants from three things: 1) a second prosecution for the same offense after acquittal; 2) a second prosecution for the same offense after conviction; and 3) multiple punishments for the same offense." *Ex parte Milner*, 394 S.W.3d 502, 506 (Tex.Crim.App.2013) (citing *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977)).

■ The double jeopardy protections are fundamental in nature. *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex.Crim.App. 2000). Because they are fundamental in nature, a double jeopardy complaint may be raised for the first time on appeal when (1) the undisputed facts show that a double jeopardy violation is clearly apparent on the face of the record and (2) enforcement of the usual rules of procedural default would serve no legitimate state interests. *Id.* Here, Appellant did not raise a double jeopardy issue either during trial or when he was sentenced. Thus, we must first decide whether Appellant can raise a double jeopardy argument for the first time on appeal or whether that right has been waived. *See id.*

■ In this case, the record is fully developed. *See Saenz v. State*, 131 S.W.3d 43, 50 (Tex.App.—San Antonio 2003), *aff'd*, 166 S.W.3d 270 (Tex.Crim.App.2005). Appellant stood trial for both offenses before the same judge and jury. Therefore, the trial court either knew or should have known of a possible double jeopardy issue. *See id.* Additionally, we have received the complete record of the trial, and we can resolve Appellant's jeopardy claims based on the record presented. There is no need for further proceedings to add new evidence to the record. *See id.* Appellant has satisfied the first prong of the *Gonzalez* test. *See Gonzalez*, 8 S.W.3d at 643.

■ In regard to the second prong of the *Gonzalez* test, enforcement of the usual rules of procedural default, in this case, would serve no legitimate state interests. The appropriate remedy for any double jeopardy violation is to affirm the conviction for the "most serious" offense and vacate any other conviction that is in violation of the double jeopardy clause. *Ex parte Cavazos*, 203 S.W.3d 333, 338–39 (Tex.Crim.App.2006). An effective double jeopardy challenge would not require a retrial or a remand to the trial court; therefore, there are no legitimate state interests that would be negatively impacted if Appellant is allowed to raise his double jeopardy claim for the first time on appeal. *See Saenz*, 131 S.W.3d at 50. Thus, Appellant has satisfied the second prong of the *Gonzalez* test, and we will review the merits of the double jeopardy issue. *See Gonzalez*, 8 S.W.3d at 643.

■ The first step in a double jeopardy challenge is to determine whether criminal solicitation to commit capital murder and attempted capital murder are the "same offense." *See Bigon v. State*, 252 S.W.3d 360, 370 (Tex.Crim.App.2008). When multiple punishments arise out of one trial, we begin our analysis with the *Blockburger* test. *Id.*; *see Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). "Under the *Blockburger* test, two offenses are not the same if one requires proof of an element that the other does not." *Bigon*, 252 S.W.3d at 370. To resolve a double jeopardy issue, we look at the elements alleged in the charging instrument. *Id.*

Appellant was charged under two indictments, and each indictment alleged a separate and distinct offense that took place on or about December 7, 2012. The allegations in the indictment for criminal solicitation to commit capital murder are:

- Michael Joseph Bien
- on or about the 7th day of December, 2012
- in Brown County
- with intent that capital murder, a capital felony, be committed
- did request, command, or attempt to induce
- Stephen Reynolds
- to engage in specific conduct
- to-wit: kill Koh Box
- for remuneration, and
- that under the circumstances surrounding the conduct of the defendant or Stephen Reynolds, as the defendant believed them to be, would have constituted capital murder.

The allegations in the indictment for attempted capital murder are:

- Michael Joseph Bien
- on or about the 7th day of December, 2012
- in Brown County
- with the specific intent to commit the offense of capital murder of Koh Box
- did do an act
- to-wit: employ Stephen Reynolds
- by remuneration or the promise of remuneration
- which amounted to more than mere preparation
- that tended but failed to effect the commission of the offense intended.

■ In comparison, the two charges are similar, but not the same. In order to obtain a conviction for criminal solicitation to commit capital murder, the State must prove that Appellant did "request, command, or attempt to induce" Stephen Reynolds to kill Koh Box for remuneration. On the other hand, in order to obtain a conviction for attempted capital murder, the State must prove that Appellant employed Stephen Reynolds by remu-

neration or the promise of remuneration, which amounted to "more than mere preparation." Under a strict application of the *Blockburger* test, the two offenses have differing elements and, therefore, would not be the same offense. However, the *Blockburger* test is a rule of statutory construction and is not the exclusive test to determine whether the two offenses are the same. *Bigon*, 252 S.W.3d at 370.

██ In *Ervin v. State*, the court provided a nonexclusive list of factors to consider when analyzing a multiple-punishment claim. 991 S.W.2d 804, 814 (Tex. Crim.App.1999). Those factors include whether the offenses are contained within the same statutory section, whether the offenses are phrased in the alternative, whether the offenses are similarly named, whether the offenses have common punishment ranges, whether the offenses have a common focus ("gravamen"), whether that common focus tends to indicate a single instance of conduct, whether the elements that differ between the offenses can be considered the same under *Blockburger*, and whether there is legislative history that contains an articulation of an intent to treat the offenses as the same or different for double jeopardy purposes. *Ervin*, 991 S.W.2d at 814. However, the ultimate question is whether the legislature intended to allow the same conduct to be punished under both of the offenses. *Bigon*, 252 S.W.3d at 371.

Criminal solicitation and criminal attempt are both in the "preparatory offenses" chapter under the "Inchoate Offenses" title of the Texas Penal Code. *See* Penal ch. 15 (West 2011 & Supp.2015). However, in this case, criminal attempt also requires the application of Section 19.03, which is the applicable statute for the underlying felony of capital murder. *Id.* § 19.03. Additionally, while the two charged offenses are in the same chapter

of the Penal Code, they are not phrased in the alternative, and there is no language in either statute that suggests that the legislature intended the two offenses to be phrased in the alternative. *See Ex parte Benson*, 459 S.W.3d 67, 78–79 (Tex.Crim. App.2015). Because criminal solicitation and attempted capital murder are not phrased in the alternative, this factor is not dispositive in this case. *Bigon*, 252 S.W.3d at 371.

██ Offenses are similarly named if they share a common word in the title. *Ex parte Benson*, 459 S.W.3d at 79. Here, the titles share only the word "criminal." Penal § 15.01 (Criminal Attempt), § 15.03 (Criminal Solicitation). In *Garfias v. State*, the defendant was charged with aggravated robbery by threat and aggravated assault causing bodily injury. 424 S.W.3d 54, 56 (Tex.Crim.App.2014). The court said that those two offenses were not named similarly. *Id.* at 61. Here, the general nature of "criminal" in the name of the offenses charged is similar to the use of "aggravated" in the name of the offenses charged in *Garfias*. Thus, the two offenses are not similarly named.

The two offenses in this case have identical punishment ranges. Criminal solicitation to commit capital murder and criminal attempt—capital murder are both first-degree felonies, and both offenses carry a punishment range of five to ninety-nine years or life, with a possibility of a fine up to $10,000. Thus, this factor supports a finding that the two offenses are the "same."

The focus, or "gravamen," of the two offenses is a key factor in the *Ervin* analysis. *Garfias*, 424 S.W.3d at 59. Here, each offense has a similar focus. The focus for criminal solicitation to commit capital murder is to "request, command, or attempt to induce" Stephen Reynolds to kill Koh Box for remuneration. The focus

of attempted capital murder is to do an act—employment of Stephen Reynolds by remuneration—which amounted to more than mere preparation in an attempt to kill Koh Box. Further, both offenses have the same *type* of focus. *See Ex parte Benson*, 459 S.W.3d at 81 (holding that felony DWI and intoxication assault are not the "same" for double jeopardy purposes because they have two different focuses and two different types of focuses). In addition, the two offenses are conduct oriented and, in this case, punish Appellant for the same act— employment of Stephen Reynolds to kill Koh Box. *See Shelby v. State*, 448 S.W.3d 431, 439 (Tex.Crim.App.2014). Specifically, the offense of attempted capital murder requires proof that Appellant solicited Stephen Reynolds to kill Koh Box. Thus, the focus of each offense tends to indicate a single instance of conduct and weighs heavily in favor of treating the offenses as the same for double jeopardy purposes. *Id.*

The last two *Ervin* factors are not applicable in this case. There are no imputed theories of liability at issue, and there is no legislative history with respect to the legislature's intent to treat the offenses the same. *See id.* at 440. Based upon our application of the *Blockburger* test and the *Ervin* factors, we hold that Appellant's double jeopardy rights were violated when he was convicted of both criminal solicitation to commit capital murder and criminal attempt–capital murder. Appellant's first issue is sustained.

 The remedy for a double jeopardy violation is to affirm the conviction for the "most serious" offense and vacate the other conviction. *Bigon*, 252 S.W.3d at 372. The "most serious" offense is the offense for which the greatest sentence was assessed. *Ex part Cavazos*, 203 S.W.3d at 338. In this case, the same term of years was assessed for each con-

viction—confinement for life. Additionally, both offenses are first-degree felonies. Because the sentences and the degree of felony is the same for both offenses, we must examine the rules governing parole eligibility and the good-conduct time. *See Bigon*, 252 S.W.3d at 372–73. Here, criminal solicitation is a "3g" offense and attempted capital murder is not. *See* Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(1)(K) (West Supp.2015). A "3g" offense limits a trial court's ability to suspend a defendant's sentence and also affects parole eligibility. *See Shankle v. State*, 119 S.W.3d 808, 813–14 (Tex.Crim. App.2003); *see also* Tex. Gov't Code Ann. § 508.145(d) (West Supp.2015). Because criminal solicitation to commit capital murder is the "most serious" offense, we will uphold that conviction and vacate the conviction for criminal attempt—capital murder.

 In Appellant's second issue, he argues that the evidence shows that Mickey Westerman, Appellant's childhood friend, induced and encouraged Appellant to proceed as Appellant did. Appellant thus asserts that he was entrapped, that the State did not refute the entrapment evidence beyond a reasonable doubt, and that the evidence was insufficient to support both convictions.

 To review the jury's rejection of an entrapment defense, we review the sufficiency of the evidence. *Hernandez v. State*, 161 S.W.3d 491, 500 (Tex.Crim.App. 2005). We review all the evidence in the light most favorable to the verdict, and we will affirm the conviction if, after reviewing all the evidence in the light most favorable to the verdict, we find that any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt and could have found against Appellant on the entrapment issue beyond a reasonable doubt. *Id.*

■ Entrapment is a defense to prosecution if (1) the defendant engaged in the conduct charged (2) because he was induced to do so by a law enforcement agent (3) who used persuasion or other means and (4) those means were likely to cause persons to commit the offense. PENAL § 8.06(a). A defendant has the initial burden to produce evidence that raises the defense of entrapment, but when he does, the burden of persuasion shifts to the State to disprove the defense beyond a reasonable doubt. *Hernandez*, 161 S.W.3d at 498.

■ Entrapment includes both a subjective and an objective component: the defendant must show both that he was actually induced to commit the charged offense and that the persuasion was such as to cause an ordinarily law-abiding person of average resistance to commit the crime. *England v. State*, 887 S.W.2d 902, 913–14 (Tex.Crim.App.1994). "Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment." PENAL § 8.06(a).

Westerman became friends with Appellant in junior high school. After Westerman dropped out of school, he only "ran into" Appellant a couple of times, and the last time was around 2000. In 2005, Westerman and Appellant began to work together in the Irving area, and while Westerman was working with Appellant, he lived in Appellant's horse trailer on Appellant's property in Ponder. While living on Appellant's property, Westerman became acquainted with Lori, Appellant's ex-wife. She often cooked supper for Westerman. Westerman worked with Appellant until Westerman moved back to Brownwood in the summer of 2005.

Westerman had not seen Appellant since 2005 and had only spoken with him three or four times after Westerman moved from Ponder. However, in March 2012, after three years with no contact, Appellant called Westerman. Based on what Appellant told him during the phone call, Westerman believed that Appellant wanted to kill Lori. Westerman called Lori to discuss the conversation that he had had with Appellant. Westerman advised Lori to call the authorities in Pecos where she lived. Lori told Westerman that she had expected Appellant to do "something like this."

Shortly after Westerman's phone call to Lori, he received a call from the chief of police in Pecos. Westerman told the chief of police that he was going to call Appellant back in a few days to make sure he was not just angry and talking "outside of his head" and that he would call the chief of police as soon as he talked to Appellant again. In Westerman's phone call to Appellant, Appellant made it clear to Westerman that who he actually wanted to kill were Lori's parents, Gale and Hugh Box. Westerman testified that he tried to talk Appellant out of it, but it seemed that he was set on killing Gale and Hugh Box. Appellant told Westerman that he had a plan but that he did not want to talk about it on the phone. Appellant expressed to Westerman that he wanted Westerman to help find someone to "get this done." Westerman testified that he did not know why Appellant called him other than perhaps Appellant thought that he could trust him because of their history of drug use together.

Texas Ranger Danny Briley was assigned to work with Westerman. Ranger Briley and Westerman met to discuss general instructions about protocol and what Ranger Briley expected of Westerman. Westerman explained that, from that point on, he was to contact Ranger Briley before he answered any calls or responded to any texts from Appellant to ensure that communications could be documented, record-

ed, or supervised. Ranger Briley was present for phone calls between Westerman and Appellant so that it could be shown what had transpired throughout the investigation. Ranger Briley explained to Westerman that he was not to instigate the commission of an offense but, rather, was only there to give Appellant the opportunity to make his own plans.

Ranger Briley testified that Westerman performed exceptionally well as a confidential informant and was the best informant that he had ever seen. Ranger Briley explained that he gave Westerman guidelines of what he should or should not say during phone calls with Appellant. Ranger Briley stated that he wanted the communication to be in a format that would allow them to determine what Appellant really wanted and would also allow Appellant the opportunity to back out completely.

At trial, the State presented recorded phone conversations between Westerman and Appellant as well as voicemails left by Appellant on Westerman's phone. In one of the phone calls, Appellant can be heard telling Westerman, "I gotta plan how to make this deal work," and Appellant expanded on what that plan was. In another phone conversation, Appellant discussed ideas on how to make Gale and Hugh disappear. He even suggested that he could personally dig a hole with a backhoe to help with the plan.

Stephen Reynolds, an agent with the Texas Department of Public Safety, posed as a "hit man." The face-to-face interactions between Agent Reynolds and Appellant were recorded, and the recordings were presented at trial. In the first meeting between "the hit man" and Appellant, Appellant discussed how he could get the money to pay for the "hit." Those ideas included selling his guns, getting a loan from Westerman, getting a loan from his mom, and selling his land and making payments to "the hit man" from the proceeds of the sale. Ranger Briley stated that the idea that Westerman loan Appellant the money originated with Appellant, not Westerman.

At some point during the investigation, Appellant went to jail for approximately six months, and the investigation stalled. However, on the day Appellant got out of jail, he called Westerman and expressed his intent to continue with his plan to hire a hit man, but this time, he said that his target was now Koh Box, Gale and Hugh's son and Lori's brother. Westerman testified that Appellant told him that "Koh Box never done me no wrong. I just want [Gale and Hugh] to pay." Appellant apparently blamed Gale and Hugh for problems Appellant had with custody issues that involved his children.

Agent Reynolds testified that, after Appellant changed his mind about the desired target of the hit, Appellant drew a map to show the location of Koh Box's house. Agent Reynolds wrote notes on the drawing of the map based on the conversation that he had with Appellant. The notes included the name of the street where Koh Box lived, a business that Koh Box owned, and vehicle descriptions. Before the initial meeting concluded, Agent Reynolds gave Appellant an opportunity to back out. He asked Appellant if he just wanted him to hurt Koh Box or if he wanted him gone, and Appellant responded, "I want him gone."

In the final meeting between Appellant and Agent Reynolds, Appellant gave one thousand dollars to Agent Reynolds to kill Koh Box. Agent Reynolds explained that he again gave Appellant an opportunity to back out, but Appellant again stated, "No, I want him gone." Agent Reynolds testified that Appellant did not appear to have any reservations about the final plan.

Although Appellant did not testify at trial, he concedes on appeal that the plan to kill Koh Box originated with him, but he argues that he had "cooled" to the idea. He asserts that he probably would not have gone through with it if Westerman had not encouraged him. Appellant also states that Westerman made him fearful of what might happen if he did not pay the hit man. Appellant cites to Ranger Briley's testimony that Westerman had told Appellant that Westerman had been "scolded" by "the hit man" because Appellant could not pay the money. Appellant also cites to the fact that Westerman told him that "it would be less obvious" if Appellant did it now rather than wait six months as suggested by Appellant.

But Ranger Briley testified that Appellant's prevailing concern was that Appellant did not want it to come back to him. He also indicated that Appellant never tried to "put the brakes" on the plan. Additionally, Appellant had months to "cool off" while, as we have noted, he was in jail on an unrelated charge. Instead, Appellant called Westerman the day he got out of jail to tell him to find a hit man soon.

The State argues that the evidence was sufficient to support the jury's rejection of Appellant's entrapment defense. A jury is authorized to weigh the evidence and decide whether the evidence establishes entrapment. *Hernandez*, 161 S.W.3d at 500. We agree with the State. When viewed in the light most favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient to support the convictions and the rejection of Appellant's entrapment defense. Appellant's second issue is overruled.

We vacate Appellant's attempted capital murder conviction in Cause No. CR22319 because that conviction violates the Double Jeopardy Clause of the U.S. Constitution. Accordingly, we reverse the judgment of the trial court in Cause No. CR22319, and we render a judgment of acquittal. *See Saenz,* 131 S.W.3d at 53. We uphold Appellant's criminal solicitation conviction and affirm the judgment of the trial court in Cause No. CR22320.