No. 92,018

STATE OF KANSAS, *Appellee*, v. RUSSELL A. POTTS *Appellant*.

(135 P.3d 1054)

Opinion filed June 9, 2006.

*Patrick H. Dunn*, assistant appellate defender, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

Davis, J.: Russell A. Potts was convicted by a jury of rape, aggravated criminal sodomy, criminal threat, and two counts of domestic battery. The Court of Appeals reversed the criminal threat conviction holding that it was multiplicitous with the convictions for either rape or aggravated criminal sodomy but rejected defendant's contention that one of his domestic battery convictions was also multiplicitous with his convictions for either rape or aggravated criminal sodomy. *State v. Potts*, 34 Kan. App. 2d 329, 118 P.3d 692 (2005). We granted the State's and the defendant's petitions for review on the issues of multiplicity. We affirm in part and reverse in part the Court of Appeals decision.

This court granted the State's petition for review of the reversal of the criminal threat conviction. This court also granted the defendant's petition for review on the single issue of whether one of the domestic battery convictions was multiplicitous with the rape and aggravated criminal sodomy convictions. This court has jurisdiction under K.S.A. 20-3018(b).

Potts and V.H. met in June 2000 and began a romantic relationship. Potts moved into V.H.'s home in December 2000. Theirs was an on-again, off-again turbulent relationship, and the charges in this case were based on a series of domestic violence incidents that occurred in December 2001 (domestic battery—acquitted), May 2002 (domestic battery—convicted), and June 2003 (criminal threat, domestic battery, aggravated criminal sodomy, and rape—convicted). Relevant to this appeal, we discuss only the facts of the June 2003 incident.

On Saturday, June 21, 2003, V.H. testified she was asleep when Potts came home around 12:30 in the morning. He got into bed and tried to initiate sex, but she told him she was tired and just wanted to sleep. He got up on one elbow and glared at her. She could tell he was angry. She said, "Oh, boy, here we go again.". Potts got up, picked up a pair of jeans, and hit her in the face with them. She pulled the covers up over her face, but he pulled them down and hit her in the face with the jeans a second time. That time, the buckle hit her in the eye.

He grabbed her by her arms and pulled her up to a sitting position on the bed. As he did this, he tore the shoulder strap of her tank top. He was angry and told her he was sick and tired of her talking down to him and thinking she was better than him. He began pounding the walls. He told her that he had gotten into a couple of fights earlier that day and that he had gotten a gun from his cousin. He said to her, "You've made me a killer. . . . I could shoot you now, and I wouldn't give a shit. . . . You don't understand. . . . I'm over the edge; I just don't give a fuck; I could kill you right now and not give a fuck."

He grabbed her by the hair and forced her down onto the floor. As he held her down by her hair, he leaned over her and yelled at her. He pulled her up off of the floor and said, "You're always trying to kick me out; now it's time for you to get kicked out." He pulled her up off of the floor and pushed her toward the living room. He opened the front door, but did not push her out. He took her into the bedroom and sat her down on the side of the bed. With his fingers in the shape of a gun, he put them to her

head and said, "Do you want to fucking die tonight?" She said, "No."

Potts then started pacing back and forth while he yelled. Then, all of a sudden, he calmed down. He lay down on the bed and she lay down beside him. He said, "What in the fuck are you doing?" So she sat up and he said, "Now what the fuck are you doing?" She started crying and said she did not know whether he wanted her to lie down or sit up. He said, "Lay your ass down." She lay down. He asked her, "How does it make you feel to know that I have to masturbate every night to get to sleep?" and "Would you rather I masturbate or have sex with you?" She said she would rather he masturbated. Potts grabbed the back of her head and told her to "suck him off." He pushed her head toward his penis and she started to perform oral sex. She was crying and started to cough. She ran to the bathroom and threw up.

V.H. returned to the bedroom, and Potts grabbed the back of her head again, pushed it toward his penis, and said, "You better not fucking throw up on my dick." She put her mouth on his penis and after a couple of minutes he pushed her head away and said, "You can't even do that any good anymore."

Potts then got on top of her and pulled her underwear off. He told her to wrap her legs around him and make him come. He penetrated her vagina with his penis. After a short while, he stopped moving, looked at her, and said, "You're pathetic." He got off of her, rolled over, and began to masturbate.

V.H. waited until Potts was asleep to get to the phone. She took the phone into the bathroom and shut the door, but Potts woke up and asked her what she was doing in there. So she flushed the toilet and went back to bed. Later, when she thought he was asleep, V.H. tried to get up to use the phone, but Potts woke up and asked her what she was doing. She decided it would be better to call after he was out of the house. Potts eventually left the house at noon, and she called the police department and told them what happened. She was told to go to the hospital and have a rape test performed. V.H. went down to the police station to report the crimes in person. She spoke to Officer Jonathan Forred, who took

a report, had photographs taken of her bruises, and had her taken to the hospital for a sexual assault examination.

According to V.H., she did not consent to performing oral sex or to having intercourse. Rather, she complied with Potts' demands because she had learned that it was better to do what Potts wanted to avoid getting hurt or being up all night getting yelled at. She also said she did not fight back because he was too strong and she was too scared. She admitted Potts did not force her head down to his penis. She also admitted she did not tell Potts "no" when he climbed on top of her, nor did she resist him when he pulled her panties off. She also admitted that during the intercourse, Potts did not choke or hit her.

Potts' version of the events of June 21, 2003, was very different from V.H.'s version. According to Potts, V.H had been suffering from depression that began in April 2003, after her son moved out of the house. Earlier in June, V.H. had come out of the bathroom with a handful of pills, saying she could end it all now. Potts took the pills from her, and they talked about what was bothering her. She cried and talked about her son being gone and about seeing her abusive ex-husband in the area.

On June 21, 2003, Potts came home around 2 a.m.. He went into the bedroom and V.H. woke up. He told her he was leaving the next day, and she said she did not care. She then got up and went into the bathroom. She was in the bathroom for about 30 minutes, and then she came out with some pills in her hand. He told her to give him the pills. He tried to grab them but she kept turning away. He grabbed her by the shoulder, turned her around, and got the pills out of her hand. He went into the bathroom and got all of the pills out of the medicine cabinet. He went into the kitchen and got all of the knives. He took everything out to the garage. When he returned to the bedroom, he told her this was why he was leaving her. He suggested calling 911, but she said no.

They talked, and Potts told her he was tired of her depression. She was sobbing and started to get sick. She ran to the bathroom and threw up. She came back to the bedroom and they continued talking about the situation for awhile. Eventually he wanted to go to sleep, but she continued sobbing and asked him to let her show

him that she could please him. He did not want to, but she was grabbing his underwear. He told her no, just go to bed, but she kept saying, "Let me show you." She got his penis out and started performing oral sex, although he was not into it. After awhile she got up and went to the bathroom and threw up again. She then returned to the bedroom and started to perform oral sex again. He said "no" and pushed her head away. She sat up and said, "I can't even do that right."

She lay down for a minute and then she tried to climb on top of him saying, "Come on, let me show you that I can please you." He said, "No, come on; no, enough." He told her to just go to sleep, and she refused. He told her that if this is what it was going to take to make her go to sleep, "let's do this." He wanted to be on top because he did not know what she might do. He was not really into it, and during the intercourse he asked her why they were doing this and if she even knew who she was with. She then called him by her ex-husband's name, and he got off of her. He said that was enough and rolled over to go to sleep.

Potts was convicted of domestic battery, criminal threat, aggravated criminal sodomy, and rape for the events of June 21, 2003. On appeal, the Court of Appeals reversed the criminal threat conviction, holding that it was multiplicitous with the convictions for either rape or aggravated criminal sodomy. The remaining convictions were affirmed. *State v. Potts*, 34 Kan. App. 2d 329.

This court granted the State's petition for review of the reversal of the criminal threat conviction. This court also granted the defendant's petition for review on the single issue of whether one of the domestic battery convictions was multiplicitous with the rape and aggravated criminal sodomy convictions.

## District Court and Court of Appeals Rulings on Multiplicity

Prior to trial, the defendant filed a motion to dismiss the June 21, 2003, domestic battery and criminal threat charges on the basis they were multiplicitous with the rape and aggravated criminal sodomy charges. Specifically, the defendant argued that the charges arising out of the alleged events of June 21, 2003, were multiplicitous because a single act of force or fear used to prove the do-

mestic battery and criminal threat charges also provided the basis for the force or fear elements of the rape and aggravated criminal sodomy charges. The district judge denied the motion, reasoning:

"Well, and Counts 3 [aggravated criminal sodomy] and 4 [rape] say 'by force or fear,' and the prior conduct certainly could create the fear. The past relationship could create fear that she would acquiesce for the last three or four months.

"But on this particular night, if I'm hearing correctly, my brief introduction to the facts of this case, that there was about a two-hour ranting and raging and some inappropriate touching or application of force, which would be the domestic battery: I'm going to blow your head off with the gun is the criminal threat, and that generates the fear for Counts 3 and 4. It doesn't—it doesn't all merge in my opinion."

On appeal, the defendant argued that the domestic battery and criminal threat convictions were multiplicitous in violation of his rights under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. His argument, as summarized by the Court of Appeals, is as follows:

"Potts contends that since V.H. never overtly objected to either the vaginal or oral sex, the 'force' element of the sex crimes must have come from Potts' movement of V.H. through her home, which was also the basis of the domestic battery complaint. He also maintains that the 'fear' element was proved by V.H.'s reaction to Potts' threats, which was the basis of the criminal threat charge. Potts believes that his actions were part of a single chain of violence and cannot be separated to produce separate crimes." *Potts*, 34 Kan. App. 2d at 335-36.

The State responded that the charges were not multiplicitous. The State contended the events of June 21, 2003, were not a continuous transaction, but rather that the defendant committed separate and distinct criminal acts over a period of time.

The Court of Appeals held that the criminal threat conviction was multiplicitous to either the aggravated criminal sodomy or the rape and vacated that conviction. *Potts*, 34 Kan. App. 2d at 338. The panel applied the following test for multiplicity:

"(1) the crimes merge, that is, they constitute a single wrongful act, or the same evidence is required to prove both crimes, but if each offense requires proof of a fact not required in proving the other, the offenses do not merge; and (2) one offense is an included offense of the other as provided in K.S.A. 2004 Supp. 21-3107(2). [Citation omitted.]" *Potts*, 34 Kan. App. 2d at 336.

The Court of Appeals further held that in order to decide whether the criminal threat and domestic battery convictions were multiplicitous, it was necessary to determine whether the evidence used to prove force or fear was also used to sustain independent convictions for domestic battery and criminal threat. 34 Kan. App. 2d at 337. The panel examined the evidence at trial and concluded that the criminal threat conviction was multiplicitous because the evidence that proved that V.H. performed oral sex and had intercourse with Potts under fear for her life was "exactly the same evidence that was used to sustain Potts' conviction for criminal threat." 34 Kan. App. 2d at 338.

Using the same analysis, the panel concluded that the domestic battery conviction was not multiplicitous. The panel determined that the evidence that Potts hit V.H. in the face with the jeans was independent sufficient evidence, apart from the evidence that Potts had moved V.H. through the house, to support the domestic battery conviction. 34 Kan. App. 2d at 338.

## Discussion

On petition for review, the State argues the Court of Appeals erred in vacating the criminal threat conviction on the ground that it was multiplicitous with the convictions for either rape or aggravated criminal sodomy. On cross-petition for review, Potts argues the Court of Appeals erred in finding that one of his domestic battery convictions was not multiplicitous with either the rape or aggravated criminal sodomy convictions.

" ' "Multiplicity is the charging of a single offense in several counts of a complaint or information. The reason multiplicity must be considered is that it creates the potential for multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution and section 10 of the Kansas Constitution Bill of Rights." ' [Citation omitted.]" *State v. Schoonover*, 281 Kan. 453, 475, 133 P.3d 48, 67 (2006) (quoting *State v. Robbins*, 272 Kan. 158, 171, 32 P.3d 171 [2001]).

"The issue of whether there is a double jeopardy violation under either the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution or § 10 of the Kansas Constitution Bill

of Rights is a question of law subject to unlimited review." *Schoonover*, 281 Kan. 453, Syl. ¶ 1.

In this case, the Court of Appeals applied a fact-based multiplicity test to conclude that the criminal threat conviction was multiplicitous: "[Offenses are multiplicitous if] the same *evidence* is required to prove both crimes, but if each offense requires *proof of a fact* not required in proving the other, the offenses do not merge." (Emphasis added.) 34 Kan. App. 2d at 336. The panel's conclusion that the criminal threat conviction was multiplicitous was based wholly on an analysis of the evidence used to prove the criminal threat and the fear element of the sex offenses.

However, after the petitions for review were filed in this case, we held in *State v. Patten*, 280 Kan. 385, Syl. ¶ 4, 122 P.3d 350 (2005), that the test for multiplicity requires a comparison of the strict elements of the offenses *"without considering the facts* that must be proven to establish those elements." (Emphasis added.) *Patten* thus provides that the multiplicity test utilized by the Court of Appeals in this case is no longer applicable.

Furthermore, we recently held in *Schoonover* that "the single act of violence/merger analysis should no longer be applied when analyzing double jeopardy or multiplicity issues in the context of multiple description cases where a defendant has been convicted of violations of multiple statutes arising from the same course of conduct." 281 Kan. at 493. Rather, we set forth the following analysis to be utilized in analyzing multiplicity/double jeopardy cases:

"In analyzing a double jeopardy issue, the overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one? Under the first component, if the conduct is discrete, *i.e.*, committed separately and severally, the convictions do not arise from the same offense and there is no double jeopardy violation. If the charges arise from the same act or transaction, the conduct is unitary and the second component must be analyzed to see if the convictions arise from the same offense. Under the second component, it must be determined whether the convictions arise from a single statute or from multiple statutes. If the double jeopardy issue arises from convictions for multiple violations of a single statute, the unit of prosecution test is applied. If the double jeopardy issue arises from multiple convictions of differ-

ent statutes, in other words it is a multiple description issue, the same-elements test is applied." 281 Kan. 453, Syl. ¶ 15.

Under the first step of the analysis, we must determine whether the complained-of charges arose out of the same conduct. Some factors to be considered are whether the acts occur at or near the same time and location, whether there is a causal relationship between the acts, and whether there is a fresh impulse motivating some of the conduct. *Schoonover*, 281 Kan. 453, Syl. ¶ 16.

Although not applying the *Schoonover* test, the State argues that Potts' crimes were committed at different times because after the acts supporting the domestic battery and criminal threat convictions, Potts calmed down and lay down on the bed before committing the crimes of aggravated criminal sodomy and rape. Potts contends his actions were part of one continuous transaction where he battered V.H. and made criminal threats to her.

Regardless of whether we view these crimes as the same conduct or as discrete acts, the same result is reached under our decision in *Schoonover*. If we were to view the period of time when Potts lay down on the bed as sufficient to distinguish the domestic battery and criminal threat charges from the rape and aggravated criminal sodomy charges as separate and discrete acts, then the convictions did not arise from the same offense, and there is no multiplicity or double jeopardy violation.

However, application of the *Schoonover* factors to this case suggests that the convictions arose from the same conduct. Potts' actions in this case occurred at nearly the same time and location. Although the defendant calmed down momentarily when he lay down on the bed, the record suggests that only a few minutes went by before he told V.H. to perform oral sex on him. All of the acts seemingly stemmed from V.H.'s refusal of Potts' sexual advances, and the evidence does not demonstrate a fresh impulse motivating some of the conduct. Rather, the evidence demonstrates that the charges arose out of the same continuous transaction involving Potts' violent reaction to V.H. repeatedly refusing his sexual advances.

As the charges arise under the same conduct or transaction, we proceed to the second step of the analysis. As the convictions in

this case arise from multiple statutes rather than the same statute, we apply the same-elements test:

"When a defendant is convicted of violations of multiple statutes arising from the same course of conduct, the test to determine whether the convictions violate § 10 of the Kansas Constitution Bill of Rights is the same-elements test: whether each offense requires proof of an element not necessary to prove the other offense. If so, the charges stemming from a single act are not multiplicitous and do not constitute a double jeopardy violation." *Schoonover*, 281 Kan. 453, Syl. ¶ 12.

Applying the same-elements test, the criminal threat conviction is not multiplicitous with the rape or aggravated criminal sodomy convictions and does not constitute a double jeopardy violation. Each offense requires proof of an element the other does not. Criminal threat requires proof of a threat to commit violence and proof that such threat was communicated with either the intent to terrorize or in reckless disregard of the risk of causing terror. See K.S.A. 2005 Supp. 21-3419(a)(1). Aggravated criminal sodomy requires proof that the defendant caused the victim to engage in sodomy without consent under circumstances when the victim was overcome by force or fear. See K.S.A. 21-3506(a)(3)(A). Rape requires proof of sexual intercourse without the victim's consent while the victim was overcome by force or fear. See K.S.A. 2005 Supp. 21-3502(a)(1)(A).

Criminal threat requires an actual threat to commit violence, while aggravated criminal sodomy does not. Aggravated criminal sodomy requires proof of an act of sodomy while criminal threat does not. See K.S.A. 2005 Supp. 21-3419(a)(1); K.S.A. 21-3506(a)(3)(A). Similarly, criminal threat and rape each require proof of different elements. Rape does not require a communicated threat to commit violence, an element of criminal threat, and criminal threat does not require proof of sexual intercourse. See K.S.A. 2005 Supp. 21-3419(a)(1); K.S.A. 2005 Supp. 21-3502(a)(1)(A).

Each offense requires proof of an element not necessary to prove the other offense. Thus, the criminal threat conviction was not multiplicitous with either the aggravated criminal sodomy or the rape convictions. Accordingly, the Court of Appeals' fact-based

analysis of the multiplicity issue and reversal of the criminal threat conviction was erroneous.

Likewise, applying the same-elements test, the domestic battery conviction is not multiplicitous with the rape or aggravated criminal sodomy convictions and does not constitute a double jeopardy violation. Each offense requires proof of an element the other does not. Domestic battery requires proof that the defendant intentionally or recklessly caused bodily harm to a member of his family or household. See K.S.A. 2005 Supp. 21-3412a(a)(1). Aggravated criminal sodomy requires proof that the defendant caused the victim to engage in sodomy without consent under circumstances when the victim was overcome by force or fear. See K.S.A. 21-3506(a)(3)(A). Rape requires proof of sexual intercourse without the victim's consent while the victim was overcome by force or fear. See K.S.A. 2005 Supp. 21-3502(a)(1)(A).

These offenses do not share identical elements. Neither aggravated criminal sodomy nor rape requires proof of bodily harm to a household member, as does domestic battery. See K.S.A. 21-3506(a)(3)(A); K.S.A. 2005 Supp. 21-3502(a)(1)(A); K.S.A. 2005 Supp. 21-3412a(a)(1). Aggravated criminal sodomy requires proof of an act of sodomy while criminal threat does not. See K.S.A. 21-3506(a)(3)(A); K.S.A. 2005 Supp. 21-3419(a)(1). Rape requires proof of sexual intercourse, which is not an element of domestic battery. See K.S.A. 2005 Supp. 21-3502(a)(1)(A); K.S.A. 2005 Supp. 21-3412a(a)(1). Because each offense requires proof of an element not necessary to prove the other offense, the Court of Appeals' conclusion that the domestic battery conviction was not multiplicitous with either the aggravated criminal sodomy or the rape convictions was the correct result, although its reasoning was not correct. See *Martin v. Cudahy Foods Co.*, 231 Kan. 397, 398, 646 P.2d 468 (1982) (affirming Court of Appeals' decision where it reached the right result for the wrong reason).

Consistent with this opinion, the decision of the Court of Appeals is affirmed in part and reversed in part. The district court is affirmed.