No. 95,723

STATE OF KANSAS, *Appellee*, v. ERRIK A. HARRIS, *Appellant.*
(162 P.3d 28)

Opinion filed July 13, 2007.

*Debra J. Wilson*, capital appellate defender, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke*, deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: In this direct appeal from his convictions on three counts of capital murder, one count of attempted first-degree murder, and one count of criminal possession of a firearm, defendant Errik Harris claims that the counts of capital murder were multiplicitous; that the district court's judgment must be amended to reflect his innocence in the murder of one victim; and that his confession should have been suppressed as involuntary.

### Factual and Procedural Background

Defendant and Darrell Stallings were involved in a series of crimes in the early morning hours of June 10, 2002, in Wyandotte County. Five people were fatally shot; a sixth was injured. The series of crimes apparently had their genesis in an aggravated battery of Stallings' mother 2 months earlier. Stallings believed that his one-time friend, Anthony Jennings, had participated in the incident.

On the evening of June 9, 2002, defendant joined Stallings at a party; the two men left the party with Patrice "Mimi" Hickmon, one of Stallings' girlfriends, who was the sister of Anthony Jennings and Tiana "Trina" Jennings. The three picked up Hickmon's friend, Tameika Jackson, and went to a club. At the club, the group encountered Anthony Jennings, with whom Stallings exchanged words. There was no further conflict at that time.

Defendant, Stallings, Hickmon, and Jackson left the club and stopped at a gas station, where defendant argued with a man named Joe Garrett. Garrett left in a car driven by Joe Watson. Stallings, defendant, and the women followed Watson's car, and Stallings began firing shots at Watson's car with his 9 mm handgun.

Stallings then drove to the home of another of his girlfriends, Rhonda Gray, where he retrieved a .40 caliber handgun and ammunition for both guns. Stallings, defendant, Hickmon, and Jackson got into Gray's car. Stallings then drove to a hotel and left Hickmon and Jackson there. Stallings armed defendant with the .40 caliber handgun and then drove to the home of Samantha Sigler, where he knew Anthony Jennings could be found. Defendant followed Stallings in another car.

At about 2:30 a.m. on June 10, while defendant waited in his car in the driveway, Stallings knocked on Sigler's door. Anthony Jennings answered, and the two men went inside. Sigler had three guests: Anthony Jennings, Melvin Montague, and Destiny Wiles. While inside, Stallings shot Montague four times with his 9 mm handgun. Anthony Jennings, Sigler, and Wiles ran out of the house; and Stallings and defendant shot at them. Anthony Jennings was hit by Stallings and defendant but survived.

Montague, Sigler, and Wiles died. Sigler had been shot five times; three of the bullets in her body were from a 9 mm gun; a .40 caliber round was recovered from the back of her head. Wiles was shot six or seven times; six .40 caliber shell casings were found next to her body.

At 3:30 a.m., Stallings, followed by defendant, arrived at Trina Jennings' home. Together they kicked the main door in. Defendant stayed by the door, but Stallings went inside and forced James Carter, a visitor in Jennings' home, to lie down. Stallings found Trina Jennings, 8 months pregnant, hiding in a closet; and he shot her several times. He then retrieved the .40 caliber gun from defendant and shot Trina Jennings several more times.

After leaving Trina Jennings' home, defendant drove back to Gray's house, switched cars, and drove to the home of his fiance, Emma Odom. He arrived there about 4 a.m.

Stallings, on the other hand, took Carter home. He then returned to the hotel and picked up Hickmon and Jackson and his son. While driving Jackson home, Stallings and Jackson argued; Stallings told Jackson to get out of the car. He then shot and killed her.

After these crimes, Stallings left town, going to Omaha with Hickmon. However, defendant turned himself in to authorities on June 11, 2002, and gave a statement to police. He and Stallings were charged jointly in an information filed that day. The State filed an amended information on June 13.

On August 20, 2002, the State filed its second amended information. Its Count I charged defendant and Stallings with criminal discharge of a firearm at an occupied motor vehicle, contrary to K.S.A. 21-4219.

The second amended information's Count II charged defendant and Stallings with "unlawfully, intentionally, and with premeditation kill[ing] **Melvin Montague** and others, to wit: Destiny Wiles, Samantha Sigler, Tiana 'Trina' Jennings, and Tameika Jackson." It further alleged that the premeditated and intentional killing of Montague was part of the same act or transaction or one of two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct, in violation of K.S.A. 21-3439.

Count III charged defendant and Stallings with "a further, different and third count" of "unlawfully, intentionally, and with premeditation kill[ing] **Destiny Wiles** and others, to wit: Melvin Montague, Samantha Sigler, Tiana 'Trina' Jennings, and Tameika Jackson." This count also further alleged that the premeditated and intentional killing of Wiles was part of the same act or transaction or one of two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct, in violation of K.S.A. 21-3439.

Count IV charged defendant and Stallings with "a further, different and fourth count" of "unlawfully, intentionally, and with premeditation kill[ing] **Samantha Sigler** and others, to wit: Melvin Montague, Destiny Wiles, Tiana 'Trina' Jennings, and Tameika Jackson." This count also further alleged that the premeditated and

intentional killing of Sigler was part of the same act or transaction or one of two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct, in violation of K.S.A. 21-3439.

Count V charged defendant and Stallings with "a further, different and fifth count" of "unlawfully, intentionally, and with premeditation kill[ing] **Tiana 'Trina' Jennings** and others, to wit: Melvin Montague, Samantha Sigler, Destiny Wiles, and Tameika Jackson." Again, this count further alleged that the premeditated and intentional killing of Trina Jennings was part of the same act or transaction or one of two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct, in violation of K.S.A. 21-3439.

Count VI charged defendant and Stallings with the attempted first-degree murder of Anthony Jennings.

Count VII charged Stallings alone with "unlawfully, intentionally, and with premeditation kill[ing] **Tameika Jackson** and others, to wit: Melvin Montague, Destiny Wiles, Tiana 'Trina' Jennings, and Samantha Sigler." It repeated the language of Counts II, III, IV, and V, which alleged that the premeditated and intentional killing of Jackson was part of the same act or transaction or one of two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct, in violation of K.S.A. 21-3439.

Count VIII charged only Stallings with felony possession of a firearm. Count IX charged only defendant with the same offense, contrary to K.S.A. 21-4204.

After a joint preliminary hearing in late November 2002, defendant was bound over for trial, and the State notified him that it intended to seek the death penalty. The State's later motion to sever Stallings' and defendant's trials was granted without objection.

Defendant sought to dismiss Counts III, IV, and V of the second amended information as multiplicitous with Count II. He argued that, to prove Count II, the State was required to establish that defendant committed four murders; Counts III, IV, and V did not require proof of any fact other than those required to establish

Count II. The State filed a pleading opposing dismissal, based both on time constraints and the merits. In the alternative, it sought an order allowing it to amend the information again. It attached a proposed third amended information to its pleading.

This proposed third amended information charged the same number of capital murders. However, each allegation of capital murder named only two victims.

Count II charged defendant and Stallings with the capital murder of Montague, naming Wiles as the second victim necessary under K.S.A. 21-3439. Count III charged defendant and Stallings with the capital murder of Wiles, naming Sigler as the second victim. Count IV charged defendant and Stallings with the capital murder of Sigler, naming Trina Jennings as the second victim. Count V charged defendant and Stallings with the capital murder of Trina Jennings, naming Montague as the second victim.

District Judge Thomas L. Boeding ultimately denied defendant's motion to dismiss. He stated, "I have spent, as you know, months trying to figure this issue out. And it's either real complicated or it's real simple, . . . but I have come to the conclusion that I am going to deny the defendant's motion to dismiss on the multiplicity issue and let the case go forward as it is charged right now." The judge did not discuss the proposed third amended information, which was never filed as a stand-alone pleading in the case.

Boeding also considered a pretrial motion to suppress defendant's confession.

At the hearing on the motion, defendant's fiance, Odom, testified that she learned on June 10 about the homicides and became aware that defendant was a suspect. At defendant's request, she said, she took defendant to the police station late that day. She testified that the police led her and defendant to believe that they knew Stallings' motive and knew that the crimes could not have been defendant's doing. She said police told her and defendant that defendant would help his situation by giving a statement.

Jaqueline Williams, Odom's sister, testified at the suppression hearing that, when defendant and Odom came to her home, defendant was fearful Stallings would hurt his family. She also testified that, when she and other family members went with defendant

and Odom to meet police, she heard police tell defendant that they knew "it wasn't him they really wanted," and that they were going to be able to work something out with him because of his surrender.

Captain Vince Davenport of the Kansas City, Kansas, Police Department testified that he was in charge of investigating the homicides. All media outlets were contacted the day of the murders, and they publicized pictures of defendant and Stallings as suspects. Davenport received a call from Odom's sister and a call from defendant, culminating in defendant's agreement to meet police at City Hall. When defendant arrived, Detectives Clayton Bye and Roger Golubski arrested him. According to Davenport, defendant waived his *Miranda* rights and gave his statement.

Bye and Golubski both testified that they were aware the district attorney was seeking an arrest warrant for capital murder. Although defendant was in custody, he was not physically restrained. He was given his *Miranda* warnings and waived them orally and in writing. The detectives said that defendant had an 11th-grade education, that he appeared intelligent and alert, and that he did not appear to be under the influence of drugs or alcohol. They also testified that they made no threats or promises and were not verbally or physically aggressive during defendant's 2½-hour interrogation. Defendant was permitted to use the bathroom as needed and given a soda to drink. Defendant never asked the detectives to stop questioning, nor did he request an attorney.

The detectives acknowledged impressing upon defendant that giving a truthful statement would be in his best interest. They also told defendant they would inform the prosecutor if he had been cooperative. Bye testified that defendant expressed fear of Stallings, whom he described as dangerous.

Defendant initially minimized his role in the crimes. When confronted with inconsistencies between his version of events and facts already known to police, he changed his story. Each successive version allocated more responsibility for events to him.

Approximately halfway through the interrogation, Bye said, defendant and the detectives reached an "impasse." Davenport then came into the interrogation room, and, after 10 or 15 minutes,

defendant began to provide substantially more information. Davenport testified that, although he might have raised his voice, he did not threaten defendant. More than once, he promised defendant that, if defendant was unconditionally cooperative, the police would make that fact known to prosecutors, which "would be viewed favorably"; Davenport did, in fact, tell prosecutors that defendant was cooperative. Davenport also testified that defendant finally "came around" because Davenport assured him that Stallings was the primary suspect.

The detectives ultimately took an audiotape-recorded statement from defendant, which was later transcribed. The district judge accepted both the audiotape and transcript for review as he considered the motion to suppress. Although the judge eventually ruled under the totality of the circumstances that defendant's confession was freely and voluntarily given, he expressed some hesitation over the interrogators' repeated reminders that it was best to tell the truth and assurances that they would tell the district attorney of defendant's cooperation. However, the court noted that Bye also told defendant unequivocally that police did not have any power to make deals, and defendant was aware of the possibility of the death penalty. The judge also noted that (1) defendant voluntarily surrendered to police with the intent to make a statement; (2) defendant was properly advised of his rights pursuant to *Miranda*, which he knowingly, freely, and voluntarily waived; (3) defendant was advised that he would be charged with murder and that the death sentence was a possibility; (4) defendant did not ask to stop the interrogation or request an attorney; and (5) defendant was not threatened or coerced.

Defendant was tried to the bench on stipulated facts. He had objected only to those portions of the stipulation derived from his confession and those designed for consideration in the sentencing phase rather than the guilt phase of his prosecution. The district judge responded by overruling the first objection. He sustained the second objection and did not consider material relevant only to sentencing in the guilt phase of the trial. The State sought dismissal of Count I, criminal discharge of a firearm; and Count V, the Trina Jennings capital murder count. The State also ultimately dropped

its pursuit of the death penalty. The judge found defendant guilty on Counts II, III, and IV for capital murder of Montague, Wiles, and Sigler; on Count VI for the attempted first-degree murder of Anthony Jennings; and on Count IX for criminal possession of a firearm. In doing so, he explicitly emphasized that he was relying upon the "Third Amended Information." The district judge dismissed Counts I, V, VII, and VIII.

Defendant was sentenced to life in prison on each capital murder conviction, with these hard 25 sentences to run consecutive to each other. He was sentenced to 226 months for attempted first-degree murder and to 8 months for criminal possession of a firearm; these two sentences were ordered to run concurrent to the consecutive capital murder sentences.

### Multiplicity Under K.S.A. 21-3439(a)(6)

Defendant argues that two of his three convictions for capital murder must be reversed based on multiplicity because the same group of related murders was used to support more than one count under K.S.A. 21-3439(a)(6).

The issue of whether convictions are multiplicitous is a question of law subject to unlimited review. *Missouri v. Hunter*, 459 U.S. 359, 368, 74 L. Ed. 2d 535, 103 S. Ct. 673 (1983); *State v. Schoonover*, 281 Kan. 453, 462, 133 P.3d 48 (2006).

The State's first response to defendant's multiplicity argument is that the motion to dismiss in the district court was untimely under K.S.A. 22-3208 because it was filed more than 20 days after his plea of not guilty. We reject this avenue to resolution. The filing date of defendant's original motion to the district court presents no bar; allegations of multiplicity in violation of double jeopardy may be considered for the first time on appeal in order to serve the ends of justice and prevent a denial of fundamental rights. *State v. Groves*, 278 Kan. 302, 303-04, 95 P.3d 95 (2004), *overruled on other grounds State v. Schoonover*, 281 Kan. 453; *State v. Moody*, 35 Kan. App. 2d 547, 567, 132 P.3d 985 (2006).

There is a preliminary matter, however, that bears further discussion. In his brief, defendant based his multiplicity claim on alleged flaws in the second amended information and did not address

the district judge's explicit invocation of the third amended information when passing judgment. Specifically, the district judge stated:

"The Court then would state for the record that the Court based upon the stipulated set of facts, it does find the defendant guilty of the crime of capital murder, an off-grid crime against a person felony, which is charged in Count II of the information, which is alleged to have occurred in Wyandotte County, Kansas, on June 10, 2002, and that involved the killing of Melvin Montague.

"In addition, the Court finds the defendant guilty of the crime of capital murder as charged in Count III of the Third Amended Information. And just so the record is perfectly clear, Count II, that I just made reference to, was also Count II from the Third Amended Information. But the Court does find the defendant guilty of the crime of cap— capital murder, an off-grid crime against a person felony, as charged in Count III of the Third Amended Information, which is alleged to have occurred on June 10, 2002, in Wyandotte County, Kansas, and involved the intentional and premeditated killing of Destiny Wiles.

"In addition, the Court finds the defendant guilty of the crime of capital murder, an off-grid crime against a person felony, as charged in Count IV, which is alleged to have occurred on June 10, 2002, in Wyandotte County, Kansas, and involved the intentional and premeditated killing of Samantha Sigler."

In spite of this language in the transcript, at oral argument before this court the prosecutor and defense counsel agreed that the district judge must have misspoken, and that he had intended to rely upon the charges as they were worded in the second amended information. Although a district judge has broad discretion to permit amendment of an information at any time before a verdict is rendered, as long as no additional or different crime is charged and the substantial rights of defendant are not prejudiced, K.S.A. 22-3201(e); see *State v. Niblock*, 230 Kan. 156, 163, 631 P.2d 661 (1981), the changes suggested in the third amended information attached to the State's response to the motion to dismiss were never made. The third amended information remained only an attachment to a brief. It never ripened into a pleading.

In another case, this fundamental disconnect between the transcript of the district judge's oral judgment of conviction and the parties' joint insistence on what the judge must actually have meant to say could stymie our consideration of the multiplicity issue. Here, however, we can confidently address the merits of defendant's argument. If he is correct in asserting that the same group of

related murders can support only one capital murder charge under K.S.A. 21-3439(a)(6), then there was a flaw in the wording of *both* the filed second amended information and the merely attached third amended information.

We begin our analysis with the words of the statute. Under K.S.A. 21-3439(a)(6), capital murder is the "intentional and premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct."

Multiplicity is the charging of a single offense in more than one count of a complaint or information; it creates the potential for multiple punishments for a single offense, violating the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. *State v. Patten,* 280 Kan. 385, 388, 122 P.3d 350 (2005).

The Double Jeopardy Clause of the Fifth Amendment provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." The provision was made applicable to the States by the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 794, 23 L. Ed. 2d 707, 89 S. Ct. 2056 (1969). Section 10 of the Bill of Rights of the Kansas Constitution entitles a defendant to the same protections against double jeopardy afforded under the United States Constitution. *Schoonover,* 281 Kan. at 473-75.

There are two types of potential multiplicity issues: "multiple description" and "unit of prosecution." This is not a multiple description case like *State v. Schoonover,* 281 Kan. 453, requiring comparison of the elements in the legislature's definitions of *two crimes.* Here, the challenged charges, Counts III and IV, alleged violations of *the same statute* that underlay Count II, with which defendant has no quibble. This case thus presents a classic unit of prosecution question. See *State v. Pham,* 281 Kan. 1227, 1247, 136 P.3d 919 (2006); *State v. Potts,* 281 Kan. 863, 871, 135 P.3d 1054 (2006); *Schoonover,* 281 Kan. at 496-98; *State v. Unruh,* 281 Kan. 520, Syl. ¶ 7, 133 P.3d 35 (2006); see *Bell v. United States,* 349 U.S. 81, 99 L. Ed. 905, 75 S. Ct. 620 (1955).

In a unit of prosecution case, the court asks how the legislature has defined the scope of conduct composing one violation of a statute. The statutory definition controls. *Schoonover*, 281 Kan. at 497. There can be only one conviction for each unit of prosecution. *Schoonover*, 281 Kan. at 472. The determination of the contours of a legislative definition and its coverage raise questions of statutory interpretation, which are issues of law reviewable de novo.

When reviewing a statute, an appellate court first attempts to give effect to the intent of the legislature as expressed. When the language of a statute is plain and unambiguous, the court must give effect to that language, rather than determine what the law should or should not be. The court will not speculate as to legislative intent or read such a statute to add something not readily found in it. *State v. Post*, 279 Kan. 664, 666, 112 P.3d 116 (2005); *State v. de la Cerda*, 279 Kan. 408, 411, 109 P.3d 1248 (2005). The court will not resort to canons of statutory construction or consult legislative history if the language of a statute is clear and unambiguous as written. See *State v. Robinson*, 281 Kan. 538, 539-540, 132 P.3d 934 (2006).

The plain and unambiguous language of K.S.A. 21-3439(a)(6) defines capital murder as multiple first-degree murders, *i.e.*, the "intentional and premeditated killing of more than one person." The statute also requires that the multiple killings be related to one another in some way, that they occur "as a part of the same act or transaction," or "in two or more acts . . . connected together or constituting parts of a common scheme or course of conduct." K.S.A. 21-3439(a)(6).

Defendant's conduct certainly satisfies this statutory definition. The stipulated facts demonstrate that he was complicit in four intentional and premeditated killings, despite the ultimate dismissal of one capital count. The three murders on which he stands convicted were connected together and constituted parts of a single course of conduct. The evidence demonstrates that they all occurred within a short span of time and were designed to avenge an earlier battery of Stallings' mother.

The question then becomes whether the legislature intended defendant's conduct to constitute only one violation of the statute

or to satisfy the definition of the statute several times over. There are other Kansas crime definitions that construct the unit of prosecution around each victim. For example, in prosecutions for involuntary manslaughter involving multiple deaths, each death constitutes a complete and distinct offense, even if the multiple deaths resulted from a single event, such as a car accident. See, *e.g.*, *State v. Jenkins*, 272 Kan. 1366, 39 P.3d 47 (2002). The difference here is that K.S.A. 21-3439(a)(6) requires multiple victims in order to have even one prosecutable offense; it is the existence of a second (or third or fourth, etc.) victim that makes murder of the first victim punishable by death.

Defendant cites *State v. Brady*, 261 Kan. 109, 929 P.2d 132 (1996), in which the defendant argued that he could not be charged with two counts of capital murder for the same two deaths under K.S.A. 21-3439(a)(6). *Brady* provides no guidance, however, because this court did not reach the issue in that case. *Brady*, 261 Kan. at 114-15.

The other case cited by defendant, *State v. Martis*, 277 Kan. 267, 83 P.3d 1216 (2004), is more helpful. In *Martis*, the amended information charged the defendant with one K.S.A. 21-3439(a)(6) capital murder for the killings of two persons. We held that the defendant had been correctly convicted and sentenced for first-degree premeditated murder of one victim and second-degree murder of the other. *Martis*, 277 Kan. at 278. In other words, one charge under K.S.A. 21-3439(a)(6) necessarily implied more than one lesser included first-degree premeditated murder, each of which, in turn, was at least theoretically capable of supporting a conviction of a still lesser included homicide offense.

The experiences of other jurisdictions also are instructive. At least two states with statutes structurally similar to our K.S.A. 21-3439(a)(6) have addressed nearly identical questions on comparable facts.

In Texas, a person commits the offense of capital murder "if he commits murder as defined under Section 19.02(b)(1) [first-degree, intentional murder] and:

"(7) the person murders more than one person:
"(A) during the same criminal transaction; or

"(B) during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct." Tex. Penal Code Ann. § 19.03(a)(7) (2003).

In *Saenz v. State*, 131 S.W.3d 43 (Tex. App. 2003) (*Saenz I*), *aff'd* 166 S.W.3d 270 (Tex. Crim. 2005), (*Saenz II*), the defendant had agreed to sell a certain amount of cocaine for his supplier but consumed most of the cocaine instead. The supplier was not pleased, and went to the defendant's house with two associates to recover the remainder of the drugs and any money they earned. The defendant, who had been expecting trouble, arranged to have two armed associates lying in wait. Defendant invited the supplier and his two associates into the defendant's home and gave the supplier what was left of the cocaine. When the defendant saw the supplier give what the defendant believed was a signal to one of supplier's associates, the defendant alerted his own armed associates. The defendant shot and killed the supplier; the defendant's associates shot and killed the supplier's associates. The defendant was charged with three counts of capital murder; each count alleging the murder of a different victim, with the two other victims supporting the "more than one person" element of the offense. Defendant was convicted, and the jury imposed life imprisonment for each count. *Saenz II*, 166 S.W.3d at 271.

Before the Texas Court of Appeals, the defendant argued that three convictions of capital murder violated double jeopardy, subjecting him to multiple punishments for the same offense. *Saenz I*, 131 S.W.3d at 48-49, 50. The Texas Court of Appeals discussed the allowable unit of prosecution under Tex. Penal Code Ann. § 19.03(a)(7)(A), concluding that the intent of the legislature, as expressed in the statute, made the allowable unit of prosecution "more than one victim." *Saenz I*, 131 S.W.3d at 52. Thus the defendant's convictions on three counts of capital murder, based on the murder of the same three victims during one criminal transaction, violated double jeopardy. *Saenz I*, 131 S.W.3d at 53. The *Saenz I* court vacated what it viewed as the two "less serious" capital convictions — those first naming the two associates of the supplier who had been shot by the defendant's associates. *Saenz I*, 131 S.W.3d at 53.

The Texas Court of Criminal Appeals granted review on this narrow issue and affirmed the Texas Court of Appeals after a comprehensive review of the legislative history of the statute. *Saenz II*, 166 S.W.3d at 274.

In Virginia, among twelve other defined offenses, the criminal code states: "The following offenses shall constitute capital murder . . . 7. The willful, deliberate, and premeditated killing of more than one person as a part of the same act or transaction." Va. Code Ann. § 18.2-31(7) (Michie 2004). Our K.S.A. 21-3439(a)(6) was patterned after this Virginia provision. Minutes of the Senate Committee on Judiciary, February 24, 1994 (detailing passage of amendment to mimic Virginia statute); Minutes of the Senate Committee on Judiciary, March 1, 1994 (reconfirming purpose of amendment to follow Virginia provision). Virginia courts have interpreted Va. Code Ann. § 18.2-31(7) to permit only one capital offense, no matter how many victims died as a result of the same act or transaction.

In *Buchanan v. Com.*, 238 Va. 389, 384 S.E.2d 757 (1989), *cert. denied* 493 U.S. 1063 (1990), the defendant was convicted of one count of capital murder for killing his father in the same transaction in which he killed his stepmother and two half brothers. He also was tried on and convicted of four separate first-degree murders, one for each victim. Regarding capital murder, the Commonwealth had filed three alternative indictments. The first charged that the defendant killed "Buchanan, Sr. as part of the same act or transaction in which he killed J.J., Donnie, *or* Mrs. Buchanan." 238 Va. at 396. The second indictment charged in Count I that the defendant killed his father and one half brother as part of the same act or transaction; its Count II charged that the defendant killed his father and stepmother as part of the same act or transaction. The third indictment charged in Count I that the defendant killed the two half brothers as part of the same act or transaction; its Count II charged that the defendant killed one of the half brothers and his stepmother as part of the same act or transaction. *Buchanan*, 238 Va. at 396-97.

The defendant argued that (1) the indictments did not allow him to focus his defense on a specific pair of killings as connected,

depriving him of his right to sufficient notice of the offenses charged; and (2) because he killed four persons as part of one act or transaction, he could be indicted only for one capital murder under Va. Code Ann. § 18.2-31(7). *Buchanan*, 238 Va. at 396-97. The Virginia Supreme Court rejected his first argument, holding that the three indictments put Buchanan on fair notice of the accusations he would be required to defend at trial. *Buchanan*, 238 Va. at 397-98.

In response to the defendant's second argument, the *Buchanan* court held that the number of capital murder *convictions* the four related murders could support

"does not control the way in which the Commonwealth can frame indictments. The Commonwealth is free to indict an individual for as many separate crimes as the Commonwealth, in good faith, thinks it can prove. Further, the Commonwealth is free to charge the commission of a single offense in several different ways in order to meet the contingencies of proof." 238 Va. at 397.

However, regardless of the number or wording of the charges in the indictments, the *Buchanan* court also held that the defendant could be convicted of only one capital murder under Va. Code Ann. § 18.2-31(7) (Michie 2004). *Buchanan*, 238 Va. at 415. It upheld his conviction for capital murder of his father in the same transaction in which he killed his stepmother and two half brothers. It vacated the defendant's first-degree murder conviction for his father's killing but permitted the defendant's three first-degree murder convictions for the killing the three other victims to stand. *Buchanan*, 238 Va. at 418.

We draw three pertinent lessons from *Buchanan.*

First, the decision reinforces our interpretation of the plain and unambiguous language in our statute, demonstrating that the allowable unit of prosecution under the provision on which K.S.A. 21-3439(a)(6) was modeled is "more than one" victim.

Second, the decision demonstrates that the allowable unit is not necessarily "two" murders. Here, this means that the State's rewording of the capital counts in the proposed third amended information would not have cured whatever flaw may have existed in the second amended information.

Finally, *Buchanan* also draws an essential distinction between charging a defendant on the one hand and convicting or punishing that defendant on the other. It illustrates that the number of capital counts or charges arising out of the related premeditated first-degree killing of multiple victims is not the source of double jeopardy concern. Rather, it is the number of convictions — *i.e.*, the number of opportunities to mete out punishment or the actual meting out of multiple punishments — that causes constitutional difficulty. Although the State cites to our *Martis* case for the proposition that the allowable unit of prosecution under K.S.A. 21-3439(a)(6) is two murders, the citation is unpersuasive. The fact that Martis involved two murders was serendipitous, not controlling. Had it involved more than two murders, we would have upheld an equal number of convictions on lesser included offenses, provided sufficient evidence supported them and the jury received proper instruction. See *Martis*, 277 Kan. at 278-79.

It is possible that a fourth point can also be taken away from the *Buchanan* decision. The Virginia Supreme Court's holding allowing the defendant's separate first-degree murder convictions for the killings of his stepmother and two half brothers to stand tells us it did not view the wording of the capital murder provision as a bar to simultaneous conviction of capital murder for multiple victims and conviction of first-degree murder for one or more of those multiple victims. See *Woodfin v. Com.*, 236 Va. 89, 96-97, 372 S.E.2d 377 (1988). This issue — one of multiple description rather than unit of prosecution — is not before us here. Thus we do not reach it.

In view of the all of the foregoing, we conclude that, in order to avoid double jeopardy under the federal and state constitutions, defendant could be convicted and punished for only one count of capital murder under K.S.A. 21-3439(a)(6). Regardless of whether the district judge misspoke at the time of passing judgment, defendant's convictions on Count III and Count IV must be vacated. The language chosen by the legislature for the defining statutory provision is plain and unambiguous; the rulings in the Texas and Virginia cases discussed above reinforce our reading of that language. The allowable unit of prosecution for capital murder under

K.S.A. 21-3439(a)(6) is the intentional and premeditated killing of more than one person.

We pause only to add that, under other circumstances, a defendant may be convicted and punished appropriately and constitutionally on multiple counts of capital murder, as that offense is defined in K.S.A. 21-3439(a)(1) through.(7). See *Brooks v. State*, 973 So. 2d 380 (Ala. Crim. App. 2007) (defendant convicted of four counts of capital murder in connection with murder of a 12-year-old boy; offense satisfied four definitions of capital murder contained in Ala. Code §13A-5-40[a] [2006]); compare *Ohio v. Keene*, an unpublished Ohio Court of Appeals opinion filed Sept. 20, 1996 (1996 WL 531606) (distinguishable statute; multiple convictions based on multiple theories, not multiple victims). We need not consider what other charges, convictions, or sentences might have been appropriate and constitutional for this defendant, however, because there is a valid capital conviction and sentence on Count II — a conviction and sentence supported by evidence of all of the related murders. That conviction stands. There will be no retrial in this case.

## Request for Amended Entry of Judgment

In this issue on appeal, defendant notes that one of the elements of each of the capital murder charges in the second amended complaint was the murder of Jackson and that there was insufficient evidence to support his guilt in her death. He seeks amendment of the judgment against him to reflect his lack of involvement in Jackson's murder.

Defendant cites no authority that would require us to entertain his request. However, he is correct about the state of the record. Stallings acted alone in killing Jackson after he and defendant had parted company for the night; Count VII in each of the informations at issue properly charged only Stallings with her capital murder. Yet Counts II, III, and IV of the second amended information named Jackson as one of defendant's victims as well. To the extent the district judge relied on the second amended information, this case will be remanded for him to clarify, via a nunc pro tunc order if necessary, that defendant had no role in Jackson's homicide. See

*State v. Hegwood,* 256Kan. 901, 906, 888 P.2d 856 (1995) (duty of a district court to correct a journal entry nunc pro tunc if journal entry fails to reflect what actually occurred in court proceeding).

## Voluntariness of Confession

Defendant's last argument on appeal is that his confession was rendered involuntary and unreliable by police misrepresentations and promises of leniency.

When analyzing a district court decision to deny suppression of a confession, we review "the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard." We do not "reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence." *State v. Ackward,* 281 Kan. 2, Syl. ¶ 1, 128 P.3d 382 (2006); *State v. Swanigan,* 279 Kan. 18, Syl. ¶ 1, 106 P.3d 39 (2005).

Voluntariness of a confession must be determined under the totality of the circumstances. The burden of proving that a confession is admissible is on the prosecution, and the required proof is by a preponderance of the evidence. Factors bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry is whether the statement was the product of the free and independent will of the accused. *State v. Sanders,* 272 Kan. 445, 452, 33 P.3d 596 (2001). We recognize that law enforcement coercion can be mental as well as physical. *State v. Waugh,* 238 Kan. 537, 541, 712 P.3d 1243 (1986).

" ' " 'It is well settled that an extrajudicial confession will not be received in evidence unless it has been freely and voluntarily made. If it has been extorted by fear or induced by hope of profit, benefit, or amelioration, it will be excluded as involuntary. However, the advice or admonition to the defendant to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent.' " [Citations omitted.]' " *State v. Wakefield,* 267 Kan. 116, 128, 977 P.2d 941 (1999).

We have held that, in order to render a confession involuntary as a product of a promise of some benefit to the accused, including

leniency, the promise must concern action to be taken by a public official; it must be such that it would be likely to cause the accused to make a false statement to obtain the benefit of the promise; and it must be made by a person whom the accused reasonably believed to have the power or authority to execute it. *State v. Banks*, 260 Kan. 918, 925, 927 P.2d 456 (1996); *State v. Norris*, 244 Kan. 326, Syl. ¶ 6, 768 P.2d 296 (1989). There is no evidence of any such promise or benefit made in this case.

Furthermore, the other types of interrogation tactics used by the detectives in this case have not been held to render confessions in other cases involuntary. *State v. Banks*, 260 Kan. at 925 (defendant told cooperation to be noted by authorities; confession not rendered involuntary); see also *State v. Newfield*, 229 Kan. 347, 359, 623 P.2d 1349 (1981) (investigator's exhortation to accused to speak truth, request for accused to confess; confession not deemed involuntary); *State v. Tillery*, 227 Kan. 342, 344, 606 P.2d 1031 (1980) (statement about things going "better" if truth told not promise of benefit vitiating voluntariness of defendant's confession); *State v. Kanive*, 221 Kan. 34, 37-38, 558 P.2d 1075 (1976) (promise of collateral benefit, with no assurance of benefit to accused on crime under inquiry, not enough to render confession involuntary, inadmissible, unless circumstances persuade court otherwise); *State v. Harwick*, 220 Kan. 572, 574-75, 552 P.2d 987 (1976) (detective's agreement to talk to district attorney about defendant's offer to "clean up" several robberies if charged only with three robberies; confession admissible, in absence of bargaining, promises).

One of the very few cases in which such tactics have had a role in suppression of a confession is *Swanigan*, 279 Kan. 18, but that outcome was heavily influenced by evidence of the defendant's low intellectual functioning and his susceptibility to being overcome by anxiety. In addition, the law enforcement agents whose conduct was under scrutiny in *Swanigan* used false information, repeatedly insisting despite their knowledge to the contrary that they had found the defendant's handprint at the scene of the crime. They also mistakenly told him that he was pictured on a surveillance videotape. *Swanigan*, 279 Kan. at 29, 32. The detectives in this

case did not engage in the sort of deliberate and negligent misstatements that characterized the interrogation of the defendant in *Swanigan*.

On the contrary, the totality of the circumstances surrounding defendant's confession here persuades us that there was no error in admitting it into evidence. Defendant had decided to turn himself in and make a statement; he called police and set up a time to meet. Defendant knew he was a suspect, knew he was probably not going home, and knew he was facing the possibility of capital murder charges. Defendant was given his *Miranda* warning and waived his rights orally and in writing. Defendant appeared to be intelligent and alert; he had an 11th-grade education and understood English; his responses were appropriate for the questions asked; and he did not appear to be under the influence of drugs or alcohol. The interrogation was not particularly long, and defendant was not physically restrained. He was permitted to use the bathroom as needed and given a drink. The detectives did not yell at defendant and made no threats. Defendant never invoked his right to stop questioning or to have a lawyer present. Even though Davenport emphasized Stallings' culpability in contrast to defendant's to gain defendant's trust, Davenport never suggested defendant would *not* get the death penalty if he cooperated. He said only that he would tell the district attorney and that full cooperation would be viewed favorably, and defendant also was told that the police had no power to make deals. In fact, the police did ultimately tell the district attorney of defendant's cooperation.

We hold that defendant's free and independent will was not overborne. His confession was properly in evidence before the district court.

Convictions and sentences on Counts III and Count IV vacated. Otherwise affirmed and remanded to amend journal entry consistent with this opinion.