

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-17-00689-CR

Antoinette **MARTINEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2015CR12772B
Honorable Catherine Torres-Stahl, Judge Presiding

Opinion by:    Irene Rios, Justice

Sitting:        Karen Angelini, Justice
                Luz Elena D. Chapa, Justice
                Irene Rios, Justice

Delivered and Filed: November 14, 2018

AFFIRMED IN PART; REVERSED AND RENDERED IN PART

A jury found appellant Antoinette Martinez guilty of two counts of capital murder. Because the State did not seek the death penalty, the trial court automatically assessed Martinez's punishment at confinement for life for each count. In six issues, Martinez contends she was prosecuted twice for a single offense of capital murder in violation of the protections against double jeopardy and challenges the sufficiency of the evidence supporting her conviction. Martinez additionally complains the trial court erred by failing to: instruct the jury on the defense

of duress; accurately apply the law of parties; or require the jury to unanimously find she committed capital murder. We affirm in part and reverse and render in part.

## BACKGROUND

Xavier Cordero's girlfriend testified he left her home at approximately 2:00 a.m. on June 18, 2014. Later that morning, at 8:36 a.m., Bexar County Sheriff's Office ("BCSO") Deputy Lopez was dispatched to a property on Donop Road, located in a rural area of south Bexar County. Lopez found a body wearing black clothing lying face down on the embankment of a stock pond. Lopez testified the body was bloodied and appeared deceased. BCSO Sergeant Perez[1] was assigned as the lead detective; he observed what appeared to be a gunshot wound at the back of the victim's head and neck area. Sergeant Perez also noted trauma to the victim's face and what appeared to be another gunshot wound to the chest. The victim found at the Donop Road location was later identified as Cordero, and it was confirmed he died as a result of the gunshot wounds.

Sergeant Perez obtained information regarding Cordero's cell phone number from Cordero's mother, who also provided Sergeant Perez with Cordero's call history. The last number contacted, according to the phone records, belonged to Antoinette Martinez. On June 20, 2014, Sergeant Perez interviewed Martinez for the first time. That same day, Cordero's car was found parked behind a strip mall.

On June 29, 2014, San Antonio Police Department ("SAPD") investigators searched the apartment of Antoinette Martinez during an unrelated aggravated robbery investigation. Ultimately, Cameo Clines confessed to committing the robbery, but during the search of Martinez's apartment, investigators found a 0.25 caliber handgun and, hidden in the toilet tank, an identification card belonging to Steven Rendon. SAPD Detective Luna testified Martinez directed

---

[1] At the time of the investigation, Sergeant Perez was a detective with the homicide unit. He has since been promoted to sergeant within the patrol division.

investigators to the handgun's location. Investigators also found wallets in the apartment not belonging to either Martinez or Clines. During the robbery investigation, SAPD Detective Zuniga received a tip to speak with Kelsey Gomez. Gomez eventually informed Detective Zuniga she had information regarding the murders, and Detective Zuniga arranged for Gomez to speak with Detective Perez.

At approximately 9:30 a.m. on June 30, 2014, BCSO Investigator Saenz[2] responded to a dispatch at a rural property, which was a cornfield in south Bexar County, in response to a witness's report that he saw a body in the cornfield. When Investigator Saenz arrived, she used binoculars to view what appeared to be a body in the cornfield — the body appeared to be decomposing, and Saenz could smell the odor of decomposing flesh. The body was later identified as Rendon; it was confirmed he died from a gunshot wound.

The morning of June 30, 2014, Detective Luna discovered Rendon was classified as a missing person. Also, on June 30, 2014, Sergeant Perez interviewed Gomez. Gomez informed Sergeant Perez that Martinez admitted to robbing and killing two men. Gomez also testified at trial that Martinez said one of the men was named Xavier and that Martinez showed Gomez an identification card belonging to a man named Steven.

Later in the day on June 30, 2014, an officer transported Martinez to the SAPD robbery division offices where she met with Detective Luna. Sergeant Perez later joined the interview. During the taped interview, Martinez told Detective Luna she met Rendon after creating a fake account on a dating site. According to Martinez, she told Clines she "found a victim" and then invited Rendon to her apartment to have sex with the intention of robbing him. Detective Luna testified that Martinez admitted to inviting Rendon to her apartment with the intention of robbing

---

[2] At the time of the investigation, Investigator Saenz was on patrol as a deputy in the patrol division.

him. Martinez told Detective Luna that she was interested in Rendon's car. Martinez also admitted during the interview that she and Clines intended to shoot Rendon, but Martinez did not want the shooting to occur in her apartment because she did not want her neighbors to hear the gunshot and did not want blood on her carpet.

Martinez offered Rendon "kinky sex," and Rendon allowed Martinez to tie his hands behind his back with tape. Once Rendon was bound, Clines came out of the bathroom with a gun. Martinez and Clines drove Rendon in his own car to the cornfield where Clines took Rendon into the cornfield to shoot him. Martinez informed Detective Luna that she heard only one shot, but she wanted to make sure Rendon was actually dead, so she directed Clines to go shoot Rendon again. Martinez then helped Clines move Rendon's body further into the cornfield.

Perez spoke with Martinez about Cordero. Luna testified Martinez admitted to knowing Cordero. Martinez told Luna she was upset with Cordero because she believed Cordero gave her chlamydia during unprotected sex, which she passed to Clines, who passed it to another girlfriend who was going to give birth to a child with chlamydia. Martinez stated she invited Cordero to her apartment for sex, but also with the intention of robbing him. When Cordero arrived, Clines came out of the bathroom with a gun and told Cordero to get on the ground. When Cordero refused, Clines hit Cordero with the gun. Investigators later confirmed Cordero's blood was found in Martinez's apartment. Detective Luna testified Martinez stated she was mad at Clines for causing Cordero to bleed on her carpet and would have shot Clines if she knew how to use the gun.

Martinez then tied Cordero's ankles and wrists using tape and forced Cordero to hop to his own car, where she and Clines instructed Cordero to get in the trunk. Martinez and Clines then drove Cordero to a remote location. Clines left Martinez in the car and took Cordero into a field. Sergeant Perez testified Martinez stated she heard two shots, but asked Clines to go back to be sure Cordero was dead. Martinez heard a third shot. Detective Luna testified that at one point during

the interview Martinez referred to herself and Clines as "Bonnie and Clyde." Sergeant Perez testified Martinez stated Clines "dump[ed] the vehicle eventually and that she and Clines disposed of Cordero's clothes and phone."

Clines, who pleaded guilty to the murders of Cordero and Rendon in a separate case, testified on Martinez's behalf. According to Clines, he knew Martinez had been raped and used that information to develop an intimate relationship with Martinez. Clines testified he went to Martinez's apartment uninvited and armed with a shotgun and a pistol. Clines told Martinez to find someone to rob. Martinez did as Clines told her — she invited Cordero to her apartment for sex. Once Cordero was at the apartment and removing his pants, Clines ambushed Cordero, ordering him to the floor. Clines then took Cordero to Cordero's car and placed him in the trunk. According to Clines, Martinez followed. Clines testified he then drove to a secluded area where he shot and killed Cordero. Clines testified Martinez never got out of the car.

Clines testified that he went to Martinez's apartment again several days later — again uninvited and armed. Clines directed Martinez to contact Rendon. Again, Martinez did as Clines instructed, and invited Rendon to her apartment for sex. Once Rendon arrived, Martinez secured Rendon with tape as Clines held a shotgun over Rendon. Clines then took Rendon to his car with Martinez and drove to an isolated area, where Clines removed Rendon from the car and shot him. Clines testified Martinez did not plan the murders with him, however she did follow his instructions, and in the case of Rendon's murder, helped Clines with Rendon's body despite not wanting to get out of the car.

The State alleged Martinez lured the men to her apartment for sex, where Martinez and Clines then subdued the men, transported them to another location, and killed them. The State charged Martinez by indictment under two theories of committing capital murder: murder in the course of committing robbery and murder of more than one person in the same criminal episode.

During pre-trial proceedings, the State indicated its intention to abandon Count 2 Paragraph A of the indictment. Prior to the beginning of voir dire, the State verified it abandoned Count 2 Paragraph A and struck the language "Paragraph B" under Count 2. The State proceeded to trial on the following allegations:

- Count 1 Paragraph A, which alleged Martinez shot Xavier Cordero (and caused his death) on June 18, 2014, and on June 25, 2014 caused the death of a second person, Steven Rendon, by shooting Rendon, and that both murders were pursuant to the same scheme or course of conduct during different criminal transactions;

- Count 1 Paragraph B, which alleged Martinez shot Cordero (and caused his death) in the course of committing or attempting to commit robbery against Cordero; and

- Count 2, which alleged Martinez shot Rendon (and caused his death) in the course of committing or attempting to commit robbery against Rendon.

The jury charge included instructions as to the means of commission for each of the counts, and the jury returned a guilty verdict for two counts of capital murder. Because the State did not seek the death penalty, the trial court automatically sentenced Martinez to life imprisonment for each count.

## DOUBLE JEOPARDY AND MISJOINDER

In issue one, Martinez contends she was prosecuted twice for the same offense of capital murder in violation of the prohibition against double jeopardy. In issue two, Martinez complains the trial court erred by entering two separate judgments and imposing two separate sentences. According to Martinez, the two counts of capital murder as charged in the indictment constitute only one offense of capital murder, not two. The State disagrees, arguing that each count of capital murder constitutes a separate offense.

### Misjoinder

It is well-settled in Texas that unless some statutory or judicial exception applies, one indictment can result in no more than one conviction and one punishment. *Ex parte Siller*, 686

S.W.2d 617, 618 (Tex. Crim. App. 1985). Thus, Martinez's two convictions cannot stand unless some statutory or judicial exception applies in this case. Article 21.24(a) of the Texas Code of Criminal Procedure is a statutory exception to the rule of only one conviction per indictment. *See* TEX. CODE CRIM. PROC. ANN. art. 21.24(a). Article 21.24(a) permits joinder of more than one offense in one indictment if the offenses arise out of the same criminal episode and each offense is stated in a separate count. *Id*.

The joinder statutes of the Penal Code allow the State to prosecute a defendant "for all offenses arising out of the same criminal episode" in a single criminal action. *See* TEX. PENAL CODE ANN. § 3.02(a). A "criminal episode" includes "the commission of two or more offenses [when] ... the offenses are the repeated commission of the same or similar offenses." *Id*. § 3.01. However, no paragraph of an indictment may charge more than one offense. TEX. CODE CRIM. PROC. ANN. art. 21.24(b). "Therefore, an indictment can allege more than one offense, but the allegations must be stated in separate counts and paragraphs." *Shavers v. State*, 881 S.W.2d 67, 73 (Tex. App.—Dallas 1994, no pet.). "Convictions on the offenses properly joined in one indictment are valid." *Id*.

Here, Count 1 alleges the capital murder of Cordero. In Paragraph A, the aggravating element alleged is the murder of Rendon pursuant to the same scheme or course of conduct. In Paragraph B, the aggravating element alleged is the murder occurred during the commission or attempted commission of robbery. Count 2 alleges the capital murder of Rendon. The aggravating element is the murder occurred during the commission or attempted commission of robbery.

Pursuant to article 21.24, the two counts were properly charged in the same indictment so long as the two counts constitute two different offenses. If the two counts are only one offense, the trial court erred by sentencing Martinez to two sentences. To determine whether the two counts

of capital murder constitute two separate offenses, we turn to Martinez's double jeopardy complaint.

## Double Jeopardy

The Double Jeopardy Clause protects against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *Lopez v. State*, 108 S.W.3d 293, 295–96 (Tex. Crim. App. 2003) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). Martinez's double jeopardy claim is based on the third category.

The State charged Martinez with two violations of the same statute — capital murder. If each violation of the statute was a separate "allowable unit of prosecution," the prohibition against double jeopardy was not implicated.

The court of criminal appeals has characterized capital murder as "the capital murder of [the victim]." *See Graham v. State*, 19 S.W.3d 851, 854 (Tex. Crim. App. 2000). In *Graham*, "[t]he indictment arose out of appellant's alleged participation in a drug-related robbery during which three individuals were killed." *Id*. at 852. The State presented the jury with a single, three-paragraph indictment alleging that appellant committed capital murder by (1) causing the death of Heimar Hurtado and the death of Danny Giraldo during the same criminal transaction; (2) causing Hurtado's death while in the course of robbing him, and (3) causing Jesus Garcia–Castro's death while in the course of robbing him. *Id*. In determining whether these accusations constituted one offense, the court of criminal appeals emphasized that "two of the three paragraphs allege *different murders* as the basis for the capital charge." *Id*. at 853 (emphasis in original). The court noted that as a predicate to charging capital murder, the Penal Code requires that a defendant commit murder as defined under section 19.02(b)(1). *Id*. "That predicate murder is then aggravated to capital murder where any one of eight additional circumstances are present." *Id*.

The court of criminal appeals then noted that in *Hathorn v. State*, 848 S.W.2d 101 (Tex. Crim. App. 1992), the murder of the appellant's father served as the predicate to the capital murder charge. *Graham*, 19 S.W.3d at 853. That murder was aggravated to capital murder "through the indictment's alternative theories that it was (1) committed in the course of robbery and burglary; (2) committed for remuneration or the promise of remuneration; or (3) murder for hire." *Id*. at 853–54. The court of criminal appeals explained that despite these three alternative theories, the indictment alleged just one offense—"the capital murder of the appellant's father." *Id*. at 854. The court then distinguished the *Hathorn* facts from those in *Graham*:

> In the instant case, however, there are multiple murders rather than multiple theories. In two of the alternative paragraphs, the indictment alleges the capital murder of Hurtado. That capital murder charge is supported by the alternative theories that appellant murdered Hurtado (1) while in the course of robbing him, and (2) during the same criminal transaction where he murdered Giraldo. The final paragraph, however, alleges a different capital murder—specifically, that of Garcia–Castro. That capital murder offense is supported by the single theory that appellant murdered Garcia–Castro while in the course of robbing him. Thus, unlike *Hathorn* where the indictment alleged multiple theories for committing one capital murder (that of the appellant's father), the indictment in the instant case alleged two distinct capital offenses (the capital murder of Hurtado and the capital murder of Garcia–Castro).

*Id*. (footnote omitted). However, the court of criminal appeals noted the following in a footnote:

> This would be a different case, of course, if the murder of Garcia–Castro was being used as an aggravating circumstance to enhance Hurtado's murder into capital murder. *See*, *e.g.*, *Shavers v. State*, 881 S.W.2d 67, 74 (Tex. App.—Dallas 1994, no pet.) (noting that although indictment contained two distinct murders, one of the murders was used as aggravating circumstance to charge a single capital murder).

*Id*. at 854 n. 3. The scenario noted in the footnote is the scenario we have before us now.

The court of criminal appeals has held that the capital murder statute allowed only a single conviction under circumstances where the State charged a defendant in a three-count indictment involving three murders alleged to have occurred in a single criminal transaction. *Saenz v. State*,

166 S.W.3d 270, 271-72 (Tex. Crim. App. 2005).[3] The court explained that the Penal Code provides that a defendant may commit capital murder in several different ways, including situations in which the defendant commits a predicate murder, with the commission of one or more additional murders in a single transaction as an aggravating circumstance. *Id*. at 273. The court pointed out that when the State is prosecuting a defendant for capital murder on this basis, its prosecution necessarily rests on the theory that the defendant killed "more than one person" in a single transaction, making this the "allowable unit of prosecution[.]" *Id*.

The court explained that in a non-capital murder case, the murder itself is the "allowable unit of prosecution," and a defendant could therefore be convicted of more than one count of murder when charged individually with the deaths of multiple victims. *Id*. at 272–73. However, in capital murder cases in which the multiple murder itself is considered to be the "allowable unit of prosecution," the defendant could not be charged or convicted of three separate counts of capital murder utilizing the same three victims for each count and may instead only be charged and convicted of a single count of capital murder. *Id*. at 274.

Here, Count 1 Paragraph A and Count 2 utilize the same victims. Martinez's double jeopardy rights were violated. Additionally, because Count 1 Paragraph A and Count 2 constitute a single offense, the indictment did not comply with article 21.24(a) of the Code of Criminal Procedure.

When multiple convictions violate the Double Jeopardy Clause, we retain the conviction for the "most serious" offense and set aside the others. *Ex parte Cavazos*, 203 S.W.3d 333, 337

---

[3] In *Saenz*, the State charged Saenz, in three counts, with the capital murders of Torres, Bravo, and Cain. Count 1 alleged the murder of Torres, with the aggravating element being the murders of Bravo and Cain. Count 2 alleged the murder of Bravo, with the aggravating element being the murders of Torres and Cain. Count 3 alleged the murder of Cain, with the aggravating element being the murders of Torres and Bravo. The jury found Saenz guilty on all three counts of capital murder and the trial court handed down three sentences. *See Saenz v. State*, 131 S.W.3d 43, 51 (Tex. App.—San Antonio 2003) *aff'd* 166 S.W.3d 270 (Tex. Crim. App. 2005).

(Tex. Crim. App. 2006). Likewise, when an indictment does not comply with article 21.24(a), the remedy is to vacate the "less serious" offense. *Saenz*, 131 S.W.3d at 53. When, as here, the degree of the offense and the term of years assessed by the factfinder are the same, we have been instructed to consider the fine assessed and restitution ordered. *See Cavazos* at 338–39. However, both convictions carry the same punishment, and the trial court did not order Martinez to pay a fine or restitution.

Although the court of criminal appeals has not addressed this issue directly, it has indicated that, all punishment factors being equal, the conviction that should be retained is generally the offense named on the first jury verdict form, and the court noted that this is generally the offense charged in the first count of the indictment. *Id*. at 339 n.8. Accordingly, we affirm the judgment on Count 1, but reverse and render a judgment of acquittal on Count 2.

## JURY INSTRUCTIONS

### *Applicable Law and Standard of Review*

"The jury charge is the means by which a judge instructs the jurors on the applicable law." *Vogt v. State*, 421 S.W.3d 233, 238 (Tex. App.—San Antonio 2013, pet. ref'd) (citing *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012)). The charge "must contain an accurate statement of the law and must set out all the essential elements of the offense." *Vasquez*, 389 S.W.3d at 366 (internal quotation omitted). The jury charge should be written "in accordance with the indictment." *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013). "'It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and to prevent confusion.'" *Reeves v. State*, 420 S.W.3d 812, 818 (Tex. Crim. App. 2013) (quoting *Williams v. State*, 547 S.W.2d 18, 20 (Tex. Crim. App. 1977)).

An application paragraph accompanies the abstract portion of a charge, applying the specific charges alleged against the defendant with the evidence presented at trial. *See Vasquez*,

389 S.W.3d at 366. "The application paragraph must: (1) specify all conditions which the jury must determine were met before a conviction under such [theory] is authorized, (2) authorize a conviction under conditions specified by other paragraph[s] of the jury charge to which the application paragraph necessarily and unambiguously refers, and (3) logically provide a basis for the combination of such paragraphs." *Vogt*, 421 S.W.3d at 239 (internal quotations omitted); *see also Vasquez*, 389 S.W.3d at 367. In short, the application paragraph must "apply the law to the facts adduced at trial." *Gray v. State*, 152 S.W.3d 125, 127 (Tex. Crim. App. 2004).

We review alleged jury-charge error in two steps: first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)); *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *see also Villareal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). "Under *Almanza*, the degree of harm required for reversal depends on whether the error was preserved in the trial court." *Villareal*, 453 S.W.3d at 433. Error properly preserved by objection will require reversal provided the defendant suffered "some harm." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013); *Ngo*, 175 S.W.3d at 743. On the other hand, error not properly preserved by objection must be "fundamental," and reversal is required only if the defendant suffered egregious harm. *Reeves*, 420 S.W.3d at 816; *Ngo*, 175 S.W.3d at 743–44. Egregious harm results from error that affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Arteaga v. State*, 521 S.W.3d 329, 338 (Tex. Crim. App. 2017); *Villareal*, 453 S.W.3d at 433.

### Denied Duress Instruction

In issue three, Martinez contends the trial court erred by denying her request for a jury instruction on the defense of duress. Martinez argues the evidence supports her assertion that she

acted under duress because Clines had guns and Martinez knew Clines could become violent. The State counters that evidence adduced at trial does not support the submission of a duress instruction.

"It is an affirmative defense to prosecution that the actor engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another." TEX. PENAL CODE ANN. § 8.05(a) (West 2011). To establish compulsion, a defendant must prove that "the force or threat of force would render a person of reasonable firmness incapable of resisting the pressure." *Id*. § 8.05(c). An imminent threat has two components: (1) the person making the threat must intend and be prepared to carry out the threat immediately and (2) the threat must be predicated on the threatened person's failure to commit the charged offense immediately. *Anguish v. State*, 991 S.W.2d 883, 886 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (citing *Devine v. State*, 786 S.W.2d 268, 270–71 (Tex. Crim. App. 1989)); *see also Cormier v. State*, 540 S.W.3d 185, 190 (Tex. App.—Houston [1st Dist.] 2017, pet ref'd). "Threats of future harm are not sufficient to prove duress." *Cormier*, 540 S.W.3d at 190; *see Devine*, 786 S.W.2d at 270-71.

"The duress defense is based on compulsion by threat and focuses on the ***conduct*** of the person making the threats." *Montgomery v. State*, 588 S.W.2d 950, 953 (Tex. Crim. App. 1979) (emphasis included). Duress is available as an affirmative defense when a defendant is "compelled" to commit the charged offense "by threat of imminent death or serious bodily injury to himself or another." *Id.* § 8.05(a). Section 8.05 further provides: "Compulsion within the meaning of this section exists only if the force or threat of force would render a person of reasonable firmness incapable of resisting the pressure." *Id.* § 8.05(c). Thus, a defendant's claim of duress must have an objective, reasonable basis. *Cameron v. State*, 925 S.W.2d 246, 250 (Tex. App.—El Paso 1996, no pet.).

If a defensive issue is raised by the evidence, the trial court should submit it to the jury. As a general rule, an accused is entitled to an affirmative defensive instruction on every issue raised by the evidence, regardless of whether such evidence is strong, feeble, unimpeached or contradicted, and even if the trial court believes the testimony is not entitled to belief. *Sanders v. State*, 707 S.W.2d 78, 80 (Tex. Crim. App. 1986), *disavowed in part on other grounds by Willis v. State*, 790 S.W.2d 307, 314 (Tex. Crim. App. 1990).

Martinez's claim of duress relies solely on Clines's testimony, in which Clines stated he knew Martinez had been raped and used that information to develop an intimate relationship with Martinez. Clines testified he went to Martinez's apartment uninvited and armed. Clines told Martinez to find someone to rob. Martinez did as Clines told her — she invited Cordero to her apartment for sex. Once Cordero was at the apartment and removing his pants, Clines ambushed Cordero, ordering him to the floor. Clines then took Cordero to his own car and placed him in the trunk. According to Clines, Martinez followed. Clines testified he then drove to a secluded area where he shot and killed Cordero. Clines testified Martinez never got out of the car.

Clines testified that he again went to Martinez's apartment several days later — again uninvited and armed. Clines directed Martinez to contact Rendon. Again, Martinez did as Clines instructed, and invited Rendon to her apartment for sex. Once Rendon arrived, Martinez secured Rendon with tape as Clines held a shotgun over Rendon. Clines then took Rendon to Rendon's car with Martinez and drove to an isolated area, where Clines removed Rendon from the car and shot him. Clines testified Martinez did not plan the murders with him, however she did follow his instructions, and in the case of Rendon's murder, helped Clines with Rendon's body despite not wanting to get out of the car. The fact that an appellant was allegedly taking orders from another is not sufficient to raise the defense of duress. *See Cameron*, 952 S.W.2d at 250 (citing *Leviness v. State*, 157 Tex. Crim. 160, 247 S.W.2d 115, 118 (Tex. Crim. App. 1952)).

On appeal, Martinez asserts she knew Clines had a violent history and carried weapons. Martinez further asserts Clines was armed when he went to her apartment. Therefore, Martinez argues, she "was clearly under the threat of imminent death or serious bodily injury given that Clines was quick to resort to violence." Martinez additionally asserts that Clines's statement that she had "better come help me bring this body into the cornfield" constituted a threat sufficient to warrant a duress instruction.

However, without evidence of a specific, objective threat, Clines's testimony and Martinez's assertions about her vague and subjective fears are insufficient as a matter of law to support an instruction on duress. *See Cameron*, 952 S.W.2d at 250 (finding defendant's testimony that he was generally afraid of co-defendant's temper insufficient to support submission of a duress instruction); *Bernal v. State*, 647 S.W.2d 699, 706 (Tex. App.—San Antonio 1982, no pet.) (defendant's testimony that he feared co-defendant "might get violent" found insufficient to support duress instruction).

We conclude Martinez has not shown that she was entitled to an instruction on the defense of duress. Accordingly, we hold the trial court did not err by refusing to include a duress instruction in the jury charge.

Issue three is overruled.

## Law of Parties

At trial, Martinez did not object to the charge as to the law of parties. On appeal, Martinez does not maintain that she objected to the law of parties or that she preserved the error at trial. Martinez specifically opines that, "[t]he trial judge is required to instruct the jury as to the conduct of the person the state claims was the primary actor, the identity of the primary actor, and the type of assistance the state claims imposes criminal responsibility on the defendant as a party."

*Application Paragraph Requirements*

The Court of Criminal Appeals has consistently held that "an application paragraph that incorporated the law of parties by stating that the defendant 'either acting alone or as a party, as that term has been defined,' sufficiently applied the law of parties to the facts of the case." *Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012) (citing *Chatman v. State*, 846 S.W.2d 329, 332 (Tex. Crim. App. 1993)); *see also Marvis v. State*, 36 S.W.3d 878, 880 (Tex. Crim. App. 2001) ("[T]he use of the phrase 'acting together' in the application portion of the charge is a reference to the abstract portion, which equates 'acting together' with 'party,'" and the jury could refer back to other portions of the charge to determine whether the defendant was criminally responsible for conduct).

"[A] general reference to the law of parties in the application paragraph is sufficient and is not error" absent an objection by the defendant or a request that the court "narrow[ ] the specific statutory modes of conduct that constitute party liability." *Vasquez*, 389 S.W.3d at 368.

*The Charge of the Court*

The relevant portion of the abstract instruction in the case provided:

> Our law provides a person is criminally responsible as a party to an offense if the offense is committed by her own conduct, or by the conduct of another for which she is criminally responsible, or by both. Each party to an offense may be charged with commission of the offense.

> Mere presence alone will not make a person a party to an offense. A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

Additionally, the application portion of the jury charge provided:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 18th day of June, 2014, in Bexar County, Texas, the defendant, Antoinette Martinez, either acting alone or together with Cameo Clines as a party, did intentionally or knowingly cause the death of an individual, namely: Xavier Cordero, by shooting Xavier Cordero with a deadly weapon, to wit: a firearm, and on the 25th day of June, 2014, either acting alone or together with Cameo Clines as a party, did then and there intentionally or knowingly cause the death of another individual, namely: Steven Rendon, by shooting Steven Rendon with a deadly weapon, to wit: a firearm, and both murders were committed pursuant to the same scheme or course of conduct, but during different criminal transactions;
>
> Or, if you find from the evidence beyond a reasonable doubt that on or about the 18th day of June, 2014, in Bexar County, Texas, the defendant, Antoinette Martinez, either acting alone or together with Cameo Clines as a party, did intentionally or knowingly cause the death of an individual, namely: Xavier Cordero, by shooting Xavier Cordero with a deadly weapon, to wit: a firearm, and Antoinette Martinez either acting alone or together with Cameo Clines as a party, was in the course of committing or attempting to commit the offense of robbery against Xavier Cordero; …

### *Discussion*

In *Vasquez*, the Court of Criminal Appeals explained that, absent an objection by the defendant, the application paragraph need only include a "general reference to the law of parties." *Vasquez*, 389 S.W.3d at 368. But if the defendant does request "a narrowing of the specific statutory modes of conduct that constitute party liability—whether he 'solicited, encouraged, directed, aided or attempted to aid' another specified person to commit the offense," the defendant "is entitled to such a narrowing." *Id*.

Here, the application paragraph tracked the language of the indictment, adequately referenced the abstract portions of the charge, and included the language "either acting alone or together with Cameo Clines as a party." *See Vasquez*, 389 S.W.3d at 367–68; *Yzaguirre*, 394 S.W.3d at 530. Martinez neither objected to the application paragraph nor made a specific request for party-liability at trial. Absent an objection and request for specificity, Martinez is not entitled to such a narrowing. *See Vasquez*, 389 S.W.3d at 368.

Martinez provides no other argument or case law to support a finding that the application paragraph on the law of parties was inadequate. Because we conclude the charge pertaining to the law of parties did not contain error, we need not conduct a harm analysis. *See, e.g. Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015).

Issue four is overruled.

**Unanimity**

In issue five, Martinez contends the court's charge to the jury denied her the right to a unanimous verdict. Martinez specifically argues jurors "were not required by the jury instructions to agree unanimously on precisely which of the complainants [Martinez] could be held responsible for killing. … The verdict forms, however, did not list the names of the complainants."

Texas law requires that jurors reach a unanimous verdict on the specific crime the defendant committed. *Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011) (citation omitted).

As described above, the State proceeded to trial on an amended indictment that charged Martinez with two counts of capital murder. The first count contained two paragraphs. The first paragraph alleged Martinez caused Cordero's death by shooting him and, pursuant to the same scheme or course of conduct, caused Rendon's death by shooting him. TEX. PENAL CODE ANN. § 19.03(a)(7)(B) (West 2011). The second paragraph alleged Martinez caused Cordero's death by shooting him in the course of committing or attempting to commit robbery. *Id*. § 19.03(a)(2). The second count alleged Martinez caused Rendon's death by shooting him in the course of committing or attempting to commit robbery. *Id*.

The jury verdict forms each include the name of the respective complainant at the top of the appropriate form. Thus, the jury was aware, when it signed each form, which complainant was the subject of the guilty verdict on that form.

In Texas, the capital murder statute requires the State to allege a "predicate murder" as defined under Penal Code section 19.02(b)(1) and any one of nine additional aggravating circumstances. *Saenz v. State*, 451 S.W.3d 388, 390 (Tex. Crim. App. 2014). The indictment "may contain as many separate paragraphs charging the same offense as is necessary to meet the contingencies of the evidence." *Graham*, 19 S.W.3d at 853 (citing *Hathorn v. State*, 848 S.W.2d 101, 113 (Tex. Crim. App. 1992)). The aggravating circumstances set out in section 19.03(a) describe alternate methods of committing capital murder. *Davis v. State*, 313 S.W.3d 317, 342 (Tex. Crim. App. 2010). "When an indictment alleges differing methods of committing capital murder in the conjunctive, the jury may properly be charged in the disjunctive." *Saenz*, 451 S.W.3d at 390 (citation omitted). The charge "may disjunctively allege 'all alternate theories of capital murder contained within [section] 19.03, whether they are found in the same or different subsections, so long as the same victim is alleged for the predicate murder.'" *Davis*, 313 S.W.3d at 342 (citing *Gamboa v. State*, 296 S.W.3d 574, 584 (Tex. Crim. App. 2009)).

Both the paragraphs under Count 1 of Martinez's indictment required proof that he murdered Cordero. Thus, Cordero's murder is the "predicate murder" under section 19.02(b)(1). The paragraphs then alleged aggravating circumstances under section 19.03(a)(2) and section 19.03(a)(7). Because those allegations merely stated alternative theories of committing the single offense of capital murder, the unanimity requirement was not violated by allowing the jury to convict without a unanimous verdict on one of the alternatives included in Count 1.

Accordingly, issue five is overruled.

### ISSUE SIX: SUFFICIENCY

In issue six, Martinez challenges the sufficiency of the evidence supporting her conviction. Martinez relies solely on the testimony of Cameo Clines, the person with whom the State alleged Martinez committed both murders, to support her contention. Clines testified on Martinez's

behalf. Without regard for the remainder of the evidence presented, Martinez argues Clines's testimony is "insufficient to establish [Martinez] was the primary actor, or a party to, or a co-conspirator to the murders of Cordero and Rendon."

***Standard of Review***

The court of criminal appeals set out the standard of review for evaluating the sufficiency of the evidence in a capital murder case in *Jenkins v. State*.

> In assessing the legal sufficiency of the evidence to support a capital murder conviction, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. Our review of "all of the evidence" includes evidence both properly and improperly admitted. We give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.
>
> The State may prove a defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. A lack of direct evidence is not dispositive of the issue of guilt. Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient. On appeal, the same standard of review is used for both circumstantial and direct evidence cases.

493 S.W.3d 583, 599 (Tex. Crim. App. 2016) (internal citations omitted).

During Martinez's recorded interview, she admitted responsibility for the murders of Cordero and Rendon. Martinez characterized herself and Clines as "Bonnie and Clyde" during the interview, and described how she lured Cordero and Rendon to her apartment on the pretense of offering sex, but with the intention of robbing each of them. Martinez further described how she tied up each man using tape, as well as how she and Clines took Cordero and Rendon each to his own vehicle and drove to isolated locations. Although Martinez did not admit to shooting either man, she related she did not want the men shot in her apartment so her neighbors would not hear

and there would not be blood in her carpet. During the murder of both Cordero and Rendon, Martinez directed Clines to make sure each man was dead.

Although Martinez relies on Clines's testimony to downplay her involvement, the jury was able to make a determination on the credibility of the witnesses and determine the weight to afford Clines's testimony. Also, in addition to the detectives' testimony describing Martinez's statements, jurors were able to view the recording of Martinez's interview in which Martinez described her own involvement in the offenses.

Upon considering all of the evidence in the light most favorable to the verdict and, based on that evidence and reasonable inferences therefrom, we determine the jury could have found all the essential elements of capital murder beyond a reasonable doubt. Accordingly, we conclude the evidence is sufficient to support Martinez's conviction in Count 1.

Issue six is overruled.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the trial court in Count 2 and render a judgment of acquittal in Count 2. Further, we affirm the judgment of the trial court in Count 1.

Irene Rios, Justice

DO NOT PUBLISH